IN THE SUPREME COURT OF THE STATE OF DELAWARE

<table>
<tr><td>SUNLINE COMMERCIAL<br>CARRIERS, INC.,</td><td>§<br>§</td><td>No. 185, 2018</td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>Plaintiff Below,<br>Appellant,</td><td>§<br>§</td><td>Court Below: Superior Court<br>of the State of Delaware</td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>v.</td><td>§</td><td>C.A. No. N15C-03-051</td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>CITGO PETROLEUM<br>CORPORATION,</td><td>§<br>§</td><td></td></tr>
<tr><td></td><td>§</td><td></td></tr>
<tr><td>Defendants Below,<br>Appellee.</td><td>§<br>§</td><td></td></tr>
</table>

Submitted: January 9, 2019
Decided: March 7, 2019

Before **STRINE**, Chief Justice; **VALIHURA** and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **REVERSED**.

Michael F. Bonkowski, Esquire, Nicholas J. Brannick, Esquire, Cole Schotz P.C., Wilmington, Delaware; Ross A. Mortillaro, Esquire (*Argued*), Stinson Leonard Street LLP, Dallas, Texas, *for Appellant, Sunline Commercial Carriers, Inc*.

Mary F. Dugan, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; John Zavitsanos, Esquire, Debora Simon Pacholder, Esquire, and Edward Goolsby, Esquire (*Argued*), Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing, P.C., Houston, Texas, *for Appellees, Citgo Petroleum Corporation*.

**STRINE**, Chief Justice:

This litigation has lasted far longer than the contractual relationship that gave rise to it. In early 2013, an oil company, CITGO Petroleum Corp., engaged a trucking company, Sunline Commercial Carriers, Inc., to ship its product under what the parties call a Master Agreement, which was to be implemented by another agreement the parties call the Term Agreement, despite the fact that both contracts have the same title: Agreement for Motor Transportation Services.[1] The Master Agreement was set to expire on December 31, 2014, but could be terminated by either party on 60 days' notice. The Term Agreement "remain[ed] in effect until the Master Agreement is expired or terminated" but also contained another sentence stating that it was a "1 Year agreement with a start date of April 1, 2013."[2]

The Term Agreement required that CITGO ship a monthly minimum to Sunline, or compensate Sunline for failing to do so. But not long into their relationship, CITGO breached the agreement by failing to ship the monthly minimum, creating what the parties call a "shortfall." After breaching, CITGO used its leverage to obtain concessions that allowed it to make up the shortfall at the end of the parties' contractual relationship. According to Sunline, these concessions

---

[1] App. to Opening Br. at A341 (Agreement for Motor Transportation Services (Jan. 9, 2013)); *id.* at A345 (Agreement for Motor Transportation Services (Mar. 23, 2013)). Although both agreements have the same name, the parties have given each agreement a name for litigation purposes. For the ease of the parties and the reader, we adopt these names.
[2] *Id.* at A346.

were procured based on CITGO's assurances that it would continue the contractual relationship for another year.[3]

But on March 31, 2014, CITGO sent Sunline a termination notice, stating "CITGO gives Sunline 60 day [sic] notice to cancel Motor Transportation Services Agreement. The transportation services, therefore will continue thru the month of May, ending on May 31st 2014."[4] Over the next two months, all of the Term Agreement's specific provisions—including price—seemed to govern the parties' relationship. During this time, CITGO shipped enough product to Sunline to meet its previously accrued shortfalls. But if the Term Agreement's minimum monthly requirement remained in place, CITGO failed meet the minimum and generated additional shortfalls. At the end of May, CITGO stopped using Sunline to ship oil.

Sunline sued and eventually moved for summary judgment, arguing that the Term Agreement remained in effect until May 31, 2014; CITGO was therefore still liable for the shortfalls generated before the termination notice; and CITGO generated shortfalls in April and May. In response, CITGO argued that the Term Agreement ended on March 31, 2014, the day CITGO sent its termination notice; that only the Master Agreement continued through May 31, 2014; and as a result,

---

[3] *Id.* at A841 (John Flinn affidavit).
[4] *Id.* at A576 (email from Jones Khan to John Flinn (March 31, 2014)).

2

CITGO had no obligation to meet the Term Agreement's minimum barrel requirements.

On Sunline's summary judgment motion, the Superior Court held, as a matter of law, that the Term Agreement ended on March 31, 2014.[5] But that holding did not end the parties' dispute. Under the Superior Court's logic, the Term Agreement ended on March 31, 2014, and therefore, the Term Agreement's monthly minimum provision had no effect during April and May 2014. Therefore, anything shipped after March 31, 2014 went towards satisfying CITGO's shortfall liability. And because CITGO shipped enough oil in April and May to satisfy its previously accumulated shortfalls, the Superior Court entered judgment in favor of CITGO.[6]

On appeal, Sunline challenges these rulings, arguing that the Superior Court's contractual interpretation is inconsistent with the Term Agreement's text, and that, in the alternative, the Term Agreement is ambiguous and parol evidence must be considered.

In this opinion, we reverse. The Superior Court's ruling—that the Term Agreement expired by its own terms on March 31, 2014—ignores the fact that the Term Agreement's text states that its "terms shall remain in effect until the Master

---

[5] *Sunline Commercial Carries, Inc. v. CITGO Petroleum Corp. (Sunline Opinion)*, 2017 WL 6618886, at *7–8 (Del. Super. Ct. Dec. 27, 2017).
[6] *Sunline Commercial Carries, Inc. v. CITGO Petroleum Corp. (Sunline Order)*, No. N15C-03-051, slip op. at 1–2 (Del. Super. Ct. Mar. 13, 2018) (ORDER).

3

Agreement is expired or terminated."[7] As we have previously recognized, we must "give each provision and term effect, so as not to render any part of the contract mere surplusage."[8] If that contractual provision was given its clear effect, then the Term Agreement remained in effect, under CITGO's own termination communication, until May 31, 2014.

To us, it seems more linguistically likely that the Term Agreement was meant to continue in force as long as the Master Agreement did. In the context of the entire relationship, the expiration date is more easily read as obligating the parties to try to refresh the agreement, and if they failed to do so, then either party could terminate the entire relationship—by terminating the Master Agreement—with 60 days' notice. CITGO's argument that a single sentence—that the Term Agreement is a "1 Year agreement with a start date of April 1, 2013"[9]—read in isolation from the rest of the Term Agreement's terms terminated the entire agreement on March 31, 2014 is less textually reasonable. Nonetheless, the Term Agreement does contain conceivably conflicting terms, which cannot be indisputably reconciled on the face of the contract, and is therefore ambiguous.[10]

---

[7] App. to Opening Br. at A346.
[8] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010).
[9] App. to Opening Br. at A346.
[10] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are

4

Because we reverse the Superior Court's finding that the Term Agreement expired on March 31, 2014, we must also reverse its holding that the oil shipped in April and May satisfied CITGO's shortfall liability.[11] CITGO was to make up the shortfalls at the end of the contract.[12] But whether the Term Agreement expired on March 31, 2014 is not clear on the contract's face, and parol evidence must be considered to determine the parties' intent.

The Superior Court, however, failed to consider parol evidence because of its earlier finding that the Term Agreement expired, as a matter of law, on March 31, 2014. The parol evidence makes summary judgment inappropriate as it supports the reasonableness of Sunline's interpretation. For instance, CITGO's termination notice suggests that the parties' entire contractual relationship—including the Term Agreement's terms—continued until May 31, 2014. In fact, the termination notice can be read to suggest that CITGO believed that the Term Agreement remained in effect until the Master Agreement expired, and that the termination notice served as the 60 days' notice under the terms of both the Term Agreement and the Master Agreement. For these reasons, a genuine dispute of material fact exists, summary

---

reasonably or fairly susceptible of different interpretations or may have two or more different meanings.").

[11] *Sunline Order*, slip op. at *1–2.

[12] Although the parties dispute all of the material terms of this alleged oral agreement, *see* Opening Br. at 31–39, both concede that the agreement allowed CITGO to make up the shortfalls at some conception of the end of their contractual relationship. *See* App. to Opening Br. at A306 (Sunline's Motion for Summary Judgment); App. to Answering Br. at B1046 (CITGO's Answering Brief in Response to Sunline's Motion for Summary Judgment).

judgment was therefore inappropriate, and Sunline is entitled to prove its claims at trial.

## I.

CITGO sells petroleum.[13]  Sunline transports petroleum.  And in 2012, the parties began discussing whether they could reach an agreement for Sunline to transport CITGO's petroleum.  Having reached an agreement on the initial terms of their relationship, on January 9, 2013, CITGO and Sunline entered into an "Agreement for Motor Transportation Services" (the "Master Agreement").[14]  The Master Agreement expired on December 31, 2014, but either party could terminate the agreement on 60 days' notice.[15]  Although Sunline would provide petroleum transportation services to CITGO under the Master Agreement, that agreement set forth only the broad terms of the parties' relationship, such as the amount of insurance Sunline was required to maintain.[16]  It was silent on key commercial terms, including price and quantity.

---

[13] These facts are undisputed, supported by the appellate record, and primarily taken from the Superior Court's opinion. *See Sunline Opinion*, 2017 WL 6618886, at *1–5.

[14] App. to Opening Br. at A344 (Agreement for Motor Transportation Services (January 9, 2013)).

[15] *Id.* at A342–44 ("This Agreement shall commence on the Effective Date and shall continue in full force and effect until December 31, 2014, unless this Agreement is terminated by either party at any time and for any reason, with or without cause, upon sixty (60) days written notice to the other party.").

[16] *See id.* at A342.

Two months later, on March 18, 2013, those terms were filled in when Sunline and CITGO agreed to the "Agreement for Motor Transportation Service" (the "Term Agreement").[17] The Term Agreement incorporated the Master Agreement by reference,[18] but the Term Agreement controlled any inconsistency between the two contracts.[19] As noted earlier, the formal name of both the Master Agreement and the Term Agreement is confusingly the same: "Agreement for Motor Transportation Services."[20]

The Term Agreement required CITGO to provide Sunline with a minimum amount of petroleum to transport each month. If CITGO delivered fewer barrels than the monthly minimum, then a "shortfall" was created, and CITGO would be obligated to pay Sunline about $4.26 per shortfall barrel.[21] Otherwise, the price CITGO paid Sunline was based on the number of miles Sunline transported the petroleum.[22] Critical to this dispute, the Term Agreement also provided various mechanisms to end the parties' relationship. Those terms were:[23]

---

[17] *See id.* at A345.

[18] *Id.* at A345 ("The terms and conditions of the Agreement for Motor Transportation Services between the parties dated January 9, 2013 (the 'Master Agreement') shall apply to this Agreement and are incorporated herein by reference.").

[19] *Id.* ("To the extent of any inconsistent or conflicting terms between this Agreement and the Master Agreement, this Agreement shall govern and control.").

[20] *See id.* at A341, 345.

[21] *Id.* at A346.

[22] *Id.* The pricing scale increased the cost of transportation as the mileage increased. For instance, if Sunline transported the oil 200 miles, Sunline would be paid $5.34 per barrel. But if Sunline transported the oil 300 miles, it would be paid $7.37 per barrel.

[23] We have attempted to replicate the formatting of the actual agreement.

Both parties, CITGO and Sunline, agree that the following terms shall remain in effect until the Master Agreement is expired or terminated.

| | |
|---|---|
| Term of Agreement | 1 Year agreement with a start date of April 1, 2013. Both parties agree to review terms 60 days prior to expiration date and review pricing and volumes. If both parties agree on terms and volumes, this Agreement will be renewed with the agreed upon start date and term of agreement. |
| | . . . |
| Termination | Termination of the Agreement by either party must be given at least 60 days prior to the expiration of the Agreement in writing.[24] |

Things went smoothly until, in June 2013, CITGO failed to deliver the minimum monthly volume of petroleum to Sunline. Although the Term Agreement required CITGO to deliver at least 240,000 barrels to Sunline in June, CITGO delivered only 142,405 barrels, generating a 97,595-barrel shortfall.[25]

When Sunline invoiced CITGO for the June shortfall, CITGO asked if Sunline would "add" the shortfalls to "the end of the contract."[26] During the negotiations

---

[24] *Id.* at A345–46.
[25] *Sunline Opinion*, 2017 WL 6618886 at *1.
[26] App. to Opening Br. at A434 (email from Jones Khan to John Flinn (Aug. 13, 2013)).

8

about the June shortfalls, CITGO continued to accrue shortfalls in July, August, and September, and the parties continued to discuss how to handle them. In late September 2013, Sunline sent CITGO an invoice for the June, July, and August shortfalls, requesting 30% of the amount due immediately and moving 70% "to the end of the contract."[27] Although CITGO acknowledged receipt of the invoice, by November 15, 2013 CITGO had still not paid any of the shortfall amount due to Sunline.[28]

In December 2013, Sunline sent another invoice to CITGO, requesting 20% of the shortfall for June, July, August, and September. According to Sunline's president, Sunline agreed to push out some of CITGO's payments because it wanted CITGO to renew the contract.[29] CITGO paid 20% of the then outstanding shortfalls on December 26, 2013; the remaining shortfalls were to be satisfied at "the end of the Contract."[30]

CITGO nevertheless continued to generate shortfalls in December of 2013 and February of 2014. When Sunline began to discuss these shortfalls with CITGO,

---

[27] *Id.* at A520 (email from John Flinn to Jones Khan (Sept. 26, 2013)).
[28] Opening Br. at 10.
[29] App. to Opening Br. at A840–42 (Affidavit of John Flinn (May 15, 2017)) ("On December 10, 2013, after the call with Michael Barrett and Jones Khan, I sent an e-mail to several Sunline employees informing them of my understanding of the call. Specifically, my understanding was that in exchange for allowing CITGO to pay 20% of its shortfall obligation now, with the remaining 80% pushed to a later date, CITGO would renew the Contract for another year, until May 2015.").
[30] *Id.* at A842.

Sunline allegedly agreed that CITGO could pay 20% of the December shortfall now and 80% at the end of the contract, but Sunline required CITGO to pay the February shortfall in full.[31] CITGO also generated a shortfall in March 2014, and Sunline required CITGO to pay it in full too.[32] Ultimately, CITGO paid Sunline for 20% of the December shortfall and all of the February and March shortfalls.[33]

Shortcutting the parties' ongoing negotiations over the shortfalls, on March 31, 2014, CITGO sent Sunline a 60-day cancellation notice, stating that "CITGO Petroleum Corporation gives Sunline Commercial Carriers Inc. 60 day [sic] notice to cancel Motor Transportation Services Agreement. The transportation services, therefore will continue thru the month of May, ending on May 31st 2014."[34] Although both contracts are titled "Agreement for Motor Transportation Services," the termination notice canceled the "Motor Transportation Services Agreement." Logically, this slight change appears to just be a way of referring to both the Term Agreement and the Master Agreement, and the next sentence's reference to the "transportation services" makes it reasonable to read the notice as applying to both of the contracts that were involved in the performance of these services. Therefore, at best for CITGO, its notice is unclear as to whether it was terminating both

---

[31] *Id.*; Opening Br. at 10–11.
[32] App. to Opening Br. at A843.
[33] Opening Br. at 10–12.
[34] App. to Opening Br. at A576 (email from Jones Khan to John Flinn (March 31, 2014)).

agreements or just one (and if just one which one). The termination notice also gave 60 days' notice, the time frame for terminating both the Term Agreement[35] and the Master Agreement.[36]

At this point, CITGO had accumulated a 337,969 barrel shortfall.[37] CITGO continued to ship oil through Sunline during both April and May, shipping 211,163 and 147,782 barrels, respectively, during those two months, over 20,000 barrels more than the previously accumulated shortfall.[38] And CITGO paid Sunline for the April and May volumes based on the Term Agreement's pricing formula. At the end of May, CITGO stopped using Sunline to transport petroleum.

On August 11, 2014, Sunline sent CITGO a breach of contract notice, stating that "[i]n June, July, August, September and December 2013, as well as February, March, April and May 2014, Citgo failed to purchase the agreed minimum number of barrels, and has failed to fully compensate Sunline for the cumulative outstanding shortfall, thereby breaching the Contract."[39] Sunline provided CITGO with the

---

[35] *Id.* at A348 ("Termination of the Agreement by either party must be given at least 60 days prior to the expiration of the Agreement in writing.")

[36] *Id.* at A343 ("This Agreement shall commence on the Effective Date and shall continue in full force and effect until December 31, 2014, unless this Agreement is terminated by either party at any time and for any reason, with or without cause, upon sixty (60) days prior written notice to the other party.").

[37] *Sunline Opinion*, 2017 WL 6618886, at *1.

[38] App. to Opening Br. at A885 (Updated Sunline Shortfall Spreadsheet).

[39] *Id.* at A612–13 (Letter from Sunline's counsel to Citgo (Aug. 11, 2014)).

11

required 30 days to cure the breach by compensating Sunline for the shortfalls,[40] but CITGO failed to cure.

Sunline then sued CITGO in the Superior Court on March 6, 2015 claiming breach of contract. CITGO answered and counter-claimed, requesting an accounting and alleging (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; and (iii) unjust enrichment.[41] The Superior Court dismissed CITGO's request for an accounting, but not its other claims.[42] After the completion of discovery, the parties filed cross-motions for summary judgment.[43] CITGO eventually abandoned its counterclaims against Sunline,[44] leaving only the cross-motions for summary judgment on the breach of contract claim.[45]

In moving for summary judgment, Sunline argued that, during the last two months of the parties' relationship, the Term Agreement's terms remained in force. As such, CITGO was obligated to ship 240,000 barrels per month, and therefore CITGO generated shortfalls in April and May.[46] Although CITGO paid for the

---

[40] *Id.*

[41] *Id.* at A116–19 (Defendant Citgo Petroleum Corporation's Answer with Affirmative Defenses and Counterclaims (Apr. 28, 2015)).

[42] Opening Br. at 1.

[43] *Id.* at 1–2.

[44] *Sunline Opinion,* 2017 WL 6618886 at *4 ("On November 30, 2017, the Defendant abandoned its counterclaims against Plaintiff.").

[45] *Id.* ("On November 30, 2017, the Defendant abandoned its counterclaims against Plaintiff, therefore making Plaintiff's Motion for Summary Judgment regarding Defendant's counterclaims moot. This is the Court's decision on the parties' remaining cross-motions for summary judgment.").

[46] CITGO sent 211,163 and 147,782 barrels to Sunline in April and May, respectively. App. to Opening Br. at A885.

volume it sent through Sunline in April and May, it did not pay Sunline's claimed April and May shortfalls and failed to pay the remaining 80% of the June, July, August, September, and December shortfalls, which would remain outstanding if CITGO was obligated to ship 240,000 barrels to Sunline in April and May.

In response, CITGO argued that the Term Agreement—by its own terms—expired on March 31, 2014, and only the Master Agreement continued in force through May 31, 2014. Thus, CITGO argued that it did not accumulate shortfalls in April and May, and satisfied the previously accumulated shortfalls during those months.

In its opinion denying Sunline's motion for summary judgment (and effectively granting CITGO summary judgment),[47] the Superior Court reviewed the Term Agreement's text, determined that it was "not so ambiguous to require resorting to extrinsic evidence," and concluded that the Term Agreement expired on March 31, 2014.[48] In its analysis, the Superior Court focused on the one-year term clause, and did not discuss the clause that kept the Term Agreement's terms in effect until the Master Agreement expired:

> [T]he Court finds Plaintiff and Defendant had a one-year agreement from April 1, 2013 to March 31, 2014 for Plaintiff to provide transportation services for a guaranteed minimum amount of petroleum products which Defendant was obligated to provide. However, if

---

[47] *See Sunline Opinion*, 2017 WL 6618886 at *9.
[48] *Id.* at *6.

there was no agreement to modify the Term Agreement before March 31, 2014, the Term Agreement by its own terms expired. Therefore, the Court finds that as of March 31, 2014, CITGO had no obligation to supply petroleum products to Plaintiff nor did Plaintiff have any obligation to provide transportation for those products. The Court finds the Plaintiff's 60–day notice argument from the "Termination" provision of the Term Agreement is simply unprevailing. Once the one-year term ended, so did any obligation under the Term Agreement. In this case, neither party "terminated" the Term Agreement, it simply ended by its own terms.[49]

Based on finding that the Term Agreement unambiguously ended on March 31, 2014, the Superior Court then concluded that "the 60 days' notice provided by CITGO . . . only related to its continued relationship under the Master Agreement," and because the Master Agreement did not provide pricing terms, CITGO "was under no obligation to meet monthly minimum barrel requirements in April or May of 2014 pursuant to that document."[50]

But that did not end the Superior Court's inquiry. The Superior Court went on to find that "[b]ecause CITGO continually failed to meet minimum barrel requirements set forth in the Term Agreement[,] *[i]t appears* this caused the parties to orally agree to a continuation of the relationship for an additional two months."[51] The terms of this apparent oral agreement also needed to be determined, but the

---

[49] *Id.* at *7.
[50] *Id.*
[51] *Id.* at *8 (emphasis added).

Superior Court rejected Sunline's argument that the Term Agreement's shortfall requirements continued as part of the alleged oral agreement:

> The only legal basis for Plaintiff arguing that Defendant had a continuing obligation in April and May of 2014 to continue to meet the minimum requirements was its interpretation of the Term Agreement and the 60–day notice language in the "Termination" provision. As mentioned previously, Plaintiff asserted that since the 60–day notice was not given until March 31, 2014, the minimum obligation set forth in the Term Agreement continued into April and May. Unfortunately for Plaintiff, that interpretation of the Term Agreement has been rejected by the Court. *Since the Court has held the end of the Term Agreement to be March 31, 2014, all that remains is an undisputed agreement between the parties that during the months of April and May of 2014, CITGO would make up the shortage during these months either by providing petroleum products for Plaintiff to transport or monetarily making up the difference.*[52]

According to the Superior Court, this was a sufficient basis to enter summary judgment because "ample correspondence between the parties . . . demonstrate[s] a willingness and a mutual assent to move the 2013 shortages to the end of the Term Agreement."[53] Thus, after the Superior Court's summary judgment ruling, the only remaining determination was "limited to the extent of the shortages and what monetary payments have been made to compensate Plaintiff for them."[54]

---

[52] *Id.* (emphasis added).
[53] *Id.*
[54] *Id.*

15

Both parties filed post-decision motions requesting clarification of the Superior Court's ruling.[55] After a hearing, the Superior Court issued an order, finding that (i) CITGO was not obligated to deliver minimum monthly volume to Sunline for April and May; (ii) CITGO supplied Sunline with barrels in excess of the existing shortfall in April and May; and thus (iii) CITGO "made up" its shortfalls in April and May, "resolv[ing] the outstanding issues left from the Court's [summary judgment] decision."[56] Based on that analysis, the Superior Court issued a final judgment in favor of CITGO on Sunline's claims, and Sunline timely appealed.

## II.

"We review the Superior Court's grant of summary judgment *de novo*."[57] A grant of summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[58] Questions of contract interpretation are also reviewed *de novo*.[59]

## III.

The key issue the parties dispute is when the Term Agreement ended. If, as the Superior Court found, there is no material dispute of fact that the Term Agreement ended on March 31, 2014, then the April and May oil shipments satisfied

---

[55] *Sunline Order*, slip op. at *1–2; Opening Br. at 3.
[56] *Sunline Order*, slip op. at *1–2.
[57] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).
[58] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 443 (Del. 2005) (quoting Del. Super. Ct. Civ. R. 56).
[59] *GMG Capital Invs.*, 36 A.3d at 779.

16

CITGO's previous shortfall liability. But if there is a triable question of fact as to whether the Term Agreement expired on May 31, 2014, as Sunline argues, then summary judgment was inappropriately entered, and Sunline is entitled to a trial. If Sunline is correct, then CITGO continued to accumulate shortfalls in April and May and failed to satisfy its previous shortfall liability.

On appeal, Sunline first challenges the Superior Court's interpretation of the Term Agreement, arguing that the Superior Court misinterpreted the Term Agreement by finding that it unambiguously terminated on March 31, 2014. We agree and reverse. The Term Agreement is ambiguous, and the parties are entitled to a trial where they can attempt to prove, using parol evidence, their interpretation of the contract.[60]

Sunline's second issue on appeal—that the Superior Court erred by finding that Sunline and CITGO had an undisputed agreement that permitted CITGO to make up the shortfalls in April and May 2014—is bound up in Sunline's first issue on appeal. The parties agreed that CITGO would make up the shortfalls at the end of the contract. Therefore, if the Term Agreement ended on March 31, 2014, as the Superior Court found, then any oil shipped during April and May would satisfy

---

[60] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 ("But, where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence."); *see also id.* at 783 n.27 ("When, in contrast, contractual texts are deemed ambiguous, the resolution of the ambiguity becomes a trial issue for the jury.") (quoting Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statutes*, 79 CHI.-KENT L. REV. 859, 862 (2004)).

CITGO's shortfall liability. But the Term Agreement is ambiguous and might not have expired on March 31, 2014. Thus, the Superior Court also erred by holding that any oil shipped during April and May satisfied CITGO's shortfall liability and parol evidence must be considered to determine when the Term Agreement ended.

**A.**

To determine what contractual parties intended, Delaware courts start with the text.[61] "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions," without resort to extrinsic evidence.[62] To aid in the interpretation of the text's meaning, "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party."[63] The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation

---

[61] *See Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003) ("The [contract] analysis starts with the language.").

[62] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[63] *Id.* (quoting *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del.Ch. Apr. 29, 2005)).

that would render any term "mere surplusage."[64] But general terms of the contract must yield to more specific terms.[65]

If, after applying these canons of contract interpretation, the contract is nonetheless "reasonably susceptible [to] two or more interpretations or may have two or more different meanings,"[66] then the contract is ambiguous and courts must resort to extrinsic evidence to determine the parties' contractual intent.[67] Here, the contract's terms contradict each other, are susceptible to two meanings, and are thus ambiguous.[68]

---

[64] *Osborn*, 991 A.2d at 1159–60 (quoting *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 2010 WL 779992, *2 (Del. Mar. 8, 2010)); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 203 ("In the interpretation of a promise or agreement or a term thereof, the following standards of preference are generally applicable: (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); *id.* cmt. b ("Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous.").

[65] *DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one."); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 236(c) ("Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions.").

[66] *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del.1996).

[67] *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998) ("[I]f there existed an ambiguous provision in a negotiated bilateral agreement, extrinsic evidence should be considered if it would tend to help the court interpret such a provision.").

[68] CITGO asserts that whether the contract is ambiguous is not properly before this Court because Sunline did not argue that the contract was ambiguous below. Answering Br. at 24. But whether a contract is unambiguous is a question of law; this Court cannot find an ambiguous contract unambiguous because each party interprets the contract differently to find it unambiguous. Indeed, in many contract disputes, both parties argue for different interpretations, but claim that the contract is unambiguous. *See Motorola, Inc. v. Amkor Techs., Inc.*, 849 A.2d 931, 937–38 (Del. 2004) (finding a contract ambiguous despite the fact that both parties argued that it was unambiguous).

19

The Term Agreement first states that "the following terms shall remain in effect until the Master Agreement is expired or terminated."[69] Because the Master Agreement terminated on May 31, 2014,[70] this clause suggests that the Term Agreement expired on May 31, 2014. But the Term Agreement's very next clause states that the Agreement is a "1 Year agreement with a start date of April 1, 2013," necessarily implying that the Term Agreement expires on March 31, 2014, one year after the start date.[71] So which governs, which controls? Both terms are clear in isolation; neither is more general or specific than the other; and reading one to control would cause the other to be a mere surplusage. In isolation, they create an ambiguity.

But we must read the contract as a whole. Unfortunately, the rest of the Term Agreement does not definitively resolve this contradiction. After specifying a one-year term, the Term Agreement goes on to say that "[b]oth parties agree to review terms 60 days prior to expiration date and review pricing and volumes. If both parties agree on terms and volumes, this Agreement will be renewed with the agreed upon start date and term of agreement."[72]

---

[69] App. to Opening Br. at A346.
[70] Because the Master Agreement expired on December 31, 2014 but could be terminated upon 60 days' notice, the parties do not dispute that the Master Agreement terminated on May 31, 2014.
[71] App. to Opening Br. at A346.
[72] *Id.*

To our minds, this language suggests that the one-year term is more of a nudge for the parties to reevaluate their relationship. That is, the 60-day provision suggests that the parties will review pricing terms 60 days before the Term Agreement's one-year anniversary. But if this pricing review breaks down, then based on the first clause—which keeps the Term Agreement's terms in effect so long as the Master Agreement was in effect—the parties can terminate the complete relationship upon 60 days' notice.

This reading of the Term Agreement is supplemented by another part of the Term Agreement, which states that "[t]ermination of the Agreement by either party must be given at least 60 days prior to the expiration of the Agreement in writing."[73] That clause suggests that 60 days' notice is required to terminate and aligns the Term Agreement's termination notice—60 days—with the Master Agreement's termination provision, which also allows for the Master Agreement to be terminated on 60 days' notice.[74] Put another way, if the parties cannot reach a mutually beneficial pricing agreement after the Term Agreement's first year of operation, then the Term Agreement is placed on "life support." The Term Agreement still remains in effect until the Master Agreement expires or is terminated, but the parties are on

---

[73] *Id.* at A348.
[74] *Id.* at A342–44.

notice that they no longer have a mutually beneficial agreement and can thus terminate the entire arrangement by terminating the Master Agreement.

Not only is this interpretation supported by the text, but it makes commercial sense too. Arranging for the capacity to haul thousands of barrels of petroleum, as Sunline had to do, requires a substantial investment in shipping capacity, which would subject it to losses if the contract ended abruptly. Likewise, CITGO had to get its product to market, and an abrupt termination by Sunline could injure it for obvious reasons. Because both parties invested substantial time, assets, and logistical capacity in creating a mutually beneficial relationship, this reading, in which the Term Agreement and Master Agreement both end simultaneously after 60 days' notice, allows each party time to reallocate resources or find alternative arrangements in an orderly fashion. Therefore, the mix of practical and textual support also supports the reasonableness of Sunline's interpretation.

CITGO argues that although the Term Agreement must "remain in effect until the Master Agreement is expired or terminated,"[75] that clause, along with the rest of the Term Agreement, nevertheless expires on March 31, 2014.[76] To us, CITGO's argument relies on one clause read in isolation and seems strained. But we cannot rule it out as a possible reading of the Term Agreement's text because we must give

---

[75] *Id.* at A346.
[76] Answering Br. at 18–33.

22

credit to each clause in the contract.[77]   And although Sunline's reading is a reasonable one, it still is in arguable tension with the one-year term language.  The Term Agreement is therefore ambiguous on its face, and parol evidence must be considered to determine the parties' intent.[78]

**B.**

Because the Superior Court found that the Term Agreement unambiguously terminated on March 31, 2014, it also held that CITGO satisfied its shortfall liability by making up the shortfalls during April and May.[79]  We also reverse that finding.

Both parties concede that CITGO was to make up the shortfalls at the end of their contractual relationship.[80]  But CITGO says the shortfalls were to be made up after the Term Agreement was terminated (on March 31, 2014, in its view), while the Master Agreement was still in effect (until May 31, 2014 under its interpretation).  By contrast, Sunline says that shortfalls were to be made up after both the Term Agreement and the Master Agreement were terminated (on May 31, 2014).  Whether CITGO could make up its shortfall liability in April and May then depends on when

---

[77] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

[78] *Salamone v. Gorman*, 106 A.3d 354, 374 (Del. 2014) ("The standard for interpreting ambiguous contracts is well settled: 'If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract.'") (quoting *In re Mobilactive Media, LLC*, 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013)).

[79] *See Sunline Order*, slip op. at *1–2.

[80] App. to Opening Br. at A306 (Sunline's Motion for Summary Judgment) ("In December 2013, the Parties ultimately resolved that CITGO would pay 20% immediately with 80% being made up, in barrels or cash, at a later date at 'the end of the Contract.'"); App. to Answering Br. at B1046 (CITGO's Answering Brief in Response to Sunline's Motion for Summary Judgment).

23

the Term Agreement terminated. Because the Superior Court found that, as a matter of law, the Term Agreement terminated on March 31, 2014, it naturally concluded that the oil shipped during April and May satisfied CITGO's shortfall liability under that expired contract. But the Term Agreement is ambiguous, and therefore parol evidence must be considered to determine when it terminated. The Superior Court, however, never considered parol evidence.

Summary judgment for CITGO might have been appropriate if all the parol evidence pointed in one direction and conclusively resolved the ambiguity in CITGO's favor, as a matter of law. That is, if the parol evidence left "no genuine issue as to any material fact," then this Court may still affirm the Superior Court.[81] But parol evidence in the record supports Sunline's interpretation that the Term Agreement and the Master Agreement expire together, and creates an issue of fact to be resolved at trial.

First, CITGO's internal understanding of the Term Agreement's terms, while it was in place, supports Sunline's textual argument that 60 days' notice was required to terminate it. For instance, an internal CITGO presentation emphasized that CITGO must provide a "cancellation notice 60 days prior [to the termination of the

---

[81] Del. Super. Ct. Civ. R. 56.

24

Term Agreement] or agreement *renews* another year."[82]  Likewise, internal CITGO email correspondence suggested that they thought 60 days' notice was required to terminate the contract.[83]  This parol evidence suggests that before CITGO ever tried to terminate the Term Agreement, its internal understanding was that 60 days' notice was required.

But the most obvious piece of evidence suggesting that the Term Agreement and the Master Agreement expire together is the termination notice CITGO provided to Sunline on March 31, 2014, the day the Term Agreement was set to expire under CITGO's interpretation.  CITGO's termination notice informed Sunline that "CITGO Petroleum Corporation gives Sunline Commercial Carriers Inc. 60 day [sic] notice to cancel Motor Transportation Services Agreement."[84]  This first clause is inherently ambiguous.  For starters, neither the Master Agreement nor the Term Agreement is entitled the "Motor Transportation Services Agreement."  In fact, both the Master Agreement and the Term Agreement are entitled the "Agreement for Motor Transportation Services,"[85] a reality that by itself tends to support Sunline's argument that the Term Agreement was to remain in effect until the entire contractual relationship under that common name expired.  Parties are unlikely to

[82] App. to Opening Br. at A451 (CPC Endorsement of Sunline Trucking Amendment to Master Transportation Services Agreement (Oct. 2013)) (emphasis added).
[83] *Id.* at A380 (Email from Becky Murchison to Jones Khan (July 25, 2013)) ("To terminate at the expiration of the contract we need to give 60 days [sic] notice.").
[84] *Id.* at A576 (email from Jones Khan to John Flinn (March 31, 2014)).
[85] *Id.* at A341, 345.

give two agreements the same name unless they intend for them to be substantially related to and dependent on one another.

To this point, CITGO's use of a proxy for the formal name of both the Term Agreement and the Master Agreement in the termination notice can be reasonably read as meaning that the termination notice applied to the parties' entire contractual relationship and therefore both contracts would terminate in 60 days on May 31, 2014. It may be that CITGO meant the termination notice to apply to only one of the agreements, that both have the same name, and that the missing "s" that would make "agreement" plural was intentional. But, if so, the notice is at best ambiguous because it does not specify which agreement it was terminating.

And importantly, the termination notice's next sentence states that, "[t]he transportation services[ ] therefore will continue thru the month of May, ending on May 31st 2014."[86] This not only seems to imply that CITGO is terminating the parties' entire contractual relationship as of May 31, 2014, but can also be read as acknowledging the primacy of the first sentence in the Term Agreement, which states that the Term Agreement "remains in effect until the Master Agreement is expired or terminated."[87]

---

[86] *Id.* at A576 (email from Jones Khan to John Flinn (March 31, 2014)).
[87] *Id.* at A346.

26

Alternatively, this last clause can also be reasonably read as an offer to extend the Term Agreement through May 31, 2014; an offer that Sunline accepted by performance.[88] The Term Agreement allows for such an extension.[89] And because the Master Agreement does not provide price terms for transportation services, the extension of those price terms would be necessary if the transportation services were to continue for another two months. Indeed, the Term Agreement's pricing terms continued to govern the parties' relationship in April and May, suggesting an extension of the Term Agreement. On a cold summary judgment record, it also must be deemed uncoincidental that CITGO sent this notice extending the parties' relationship to May 31, 2014 on March 31, 2014, the last day of the Term Agreement's existence under its interpretation. That timing suggests that even if CITGO believed that the Term Agreement was set to expire at day's end on March 31, 2014, it intended to extend the entire relationship—including the Term Agreement—until May 31, 2014.

Other parol evidence supports Sunline's contention that CITGO intended for both the Term Agreement and Master Agreement to end simultaneously on May 31, 2014. For example, contemporaneous correspondence suggests CITGO initially

---

[88] *See* RESTATEMENT (SECOND) OF CONTRACTS § 32 ("In case of doubt an offer is interpreted as inviting the offeree to accept either by promising to perform what the offer requests or by rendering the performance, as the offeree chooses.").

[89] *See* App. to Opening Br. at A346 (Agreement for Motor Transportation Services (Mar. 23, 2013)).

believed that it was subject to a monthly minimum volume requirement in April and May. For instance, in early April, Sunline sent CITGO a spreadsheet listing minimum amounts for April and May. Although CITGO challenged other aspects of the spreadsheet, CITGO was silent as to the minimum delivery amounts for both April and May.[90] Not only did CITGO not acknowledge the minimum delivery requirement, but two days after it sent the termination notice, CITGO characterized its March 31, 2014 termination notice in an email to Sunline's president as "essentially an offer to extend *the agreement* for one more month to May 31, 2014."[91] Such an extension would inherently apply to all of the Term Agreement's terms, including the minimum volume requirements.

Not only does CITGO's termination notice suggest that Sunline's interpretation is a reasonable one, but CITGO's behavior adds further credibility to Sunline's interpretation. First, even after CITGO sent its termination letter, CITGO's interactions with Sunline suggest that they thought the Term Agreement remained in effect, as suggested by Sunline's preferred reading. For instance, in a

---

[90] *Id.* at A872–73 (email from John Flinn to Jones Khan (Apr. 9, 2014)) (CITGO acknowledging shortfall volumes for April and May but disputing the amount owed for December shortfalls)

[91] *Id.* at A728 (Email from Gene Riccetti to John Flinn et al (Apr. 2, 2014)). In suggesting that the agreement only extended for one month, CITGO acknowledged that both parties had already agreed to extend the Term Agreement until April 30, 2014. *Id.* ("[T]he only agreement on a potential new term was extending the agreement one additional month to the end of April 2014.").

meeting with Sunline, CITGO allegedly acknowledged accruing a shortfall in April and that it would likely accrue one in May too.[92]

And the volume of oil CITGO shipped to Sunline during April and May can be viewed as suggesting that CITGO believed the Term Agreement's monthly minimum requirements remained in effect during April and May. On March 31, 2014, the end of the Term Agreement according to CITGO, CITGO's shortfall stood at 337,969 barrels. The Superior Court found that the parties' contemplated CITGO making up its shortfall requirement—337,969 barrels—during April and May.[93] But CITGO actually sent 358,945 barrels to Sunline during the two-month extension.[94] One reasonable inference to be drawn from CITGO sending Sunline petroleum in excess of its previously accumulated shortfalls, then, is that the Term Agreement was extended, and CITGO was attempting to send as much petroleum to Sunline as possible to minimize its April and May shortfalls, suggesting that CITGO understood that the Term Agreement remained in effect until the Master Agreement was terminated on May 31, 2014.[95]

---

[92] *Id.* at A1549 (Deposition of John Flinn 166:1–16 (Sept. 21, 2016)) ("Q: As for minimums, what was caused about the minimums? A: He [CITGO's Jones Khan] told me we needed a billing for April because they didn't meet their minimums and we sent that then out a few days later. WE talked about how many he had purchased for May. Q: What – what did he say? Did he say that – did he use the word minimums. A: My recollection is yes.").

[93] *Sunline Opinion*, 2017 WL 6618886 at *7–9; App. to Opening Br. at A432.

[94] App. to Opening Br. at A885.

[95] *See Senior Housing Capital, LLC v. SHP Senior Housing Fund, LLC*, 2013 WL 1955012, at *31 (Del. Ch. May 13, 2013) ("The parties' course of performance under a contract is a powerful indication of what the correct interpretation of that contract is.").

**IV.**

In sum, both the text of the relevant contracts and the parol evidence suggest that Sunline's interpretation is a potentially viable one, and that it is entitled to a trial to determine whether its interpretation or CITGO's ultimately prevails. Because the Superior Court (and this Court) cannot weigh evidence at the summary judgment stage,[96] a jury must evaluate this parol evidence to determine the parties' intent.[97]

The Superior Court's judgment is hereby reversed and remanded for proceedings consistent with this opinion.

---

[96] *See Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del. 1969) ("The function of a judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight.").

[97] *See GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012).