IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ERIC MONZO and DANA SPRING MONZO, | § § § | No. 199, 2020 |
| Plaintiffs Below, Appellants, | § § § § | Court Below – Superior Court of the State of Delaware |
| v. | § § | C.A. No. K18C-11-003 |
| NATIONWIDE PROPERTY & CASUALTY INSURANCE CO., | § § § § | |
| Defendant Below, Appellee. | § § § § | |

Submitted:  January 13, 2021
Decided:    March 11, 2021

Before **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED IN PART, REVERSED IN PART.**

Eric J. Monzo, Esquire, MORRIS JAMES LLP, Wilmington, Delaware; *for Appellants Eric Monzo and Dana Spring Monzo.*

Louis J. Rizzo, Jr., Esquire, REGER RIZZO & DARNALL LLP, Wilmington, Delaware; *for Appellee Nationwide Property & Casualty Insurance Company.*

**MONTGOMERY-REEVES**, Justice:

This appeal relates to an insurance coverage dispute. In 2011, Appellants Eric J. Monzo and Dana Spring Monzo purchased a homeowners insurance policy issued by Appellee, Nationwide Property & Casualty Co. ("Nationwide"). The policy contained standard exclusions for water damage and earth movement, along with optional water backup coverage.

In July 2017, a heavy thunderstorm destroyed a pedestrian bridge and retaining wall located at the Monzos' residence. A pair of engineering reports prepared after the storm indicated that a combination of water backups from drainage systems, scouring of supporting earth embankments, heavy rain, and tree debris caused the damage. The Monzos filed a claim with Nationwide, seeking coverage under the homeowners insurance policy.

Nationwide denied coverage, and the Monzos filed suit in the Superior Court. The court granted summary judgment for Nationwide, holding that the policy's earth movement and water damage exclusions applied. The Monzos appealed, arguing that the Superior Court erred by granting summary judgment too early in the discovery process, misinterpreting the policy, and denying a motion for post-judgment relief.

Having reviewed the briefs and record on appeal, the Court: (i) affirms the Superior Court's holding that Nationwide was entitled to summary judgment regarding the collapsed bridge; (ii) reverses the Superior Court's holding that Nationwide was entitled to summary

2

judgment regarding the retaining wall; and (iii) affirms the Superior Court's denial of the Monzos' post-judgment motion.

## I.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

### A.    The Monzos Purchase Homeowners Insurance from Nationwide

In July 2011, the Monzos approached Matthew Papa, an insurance agent, about purchasing comprehensive insurance coverage from Nationwide.[1]  The Monzos expressed interest in several different types of coverage, including a homeowners insurance policy covering the couple's residence in Greenville, Delaware.[2]

As part of the underwriting process, Nationwide hired Cornerstone Appraisal Services Inc. ("Cornerstone") to inspect the Greenville residence and provide a risk analysis.[3] Cornerstone drafted a report describing various aspects of the property, including two pedestrian bridges crossing a stream.[4]  After receiving Cornerstone's report, Nationwide required that the Monzos comply with various conditions, such as providing an alarm certification and installing a fireplace screen.[5]  Nationwide also required that the Monzos sign a document acknowledging that they did not purchase flood insurance.[6]  The top of the

---

[1] App. to Opening Br. 220-21 (hereafter "A_").
[2] *Id.*
[3] A222.
[4] A234.
[5] A223.
[6] A144.  The document asked the policyholder to acknowledge, "I understand that loss resulting from flood damage is not covered under my homeowners' policy, and that flood coverage is available through the National Flood Insurance Program (NFIP).  By signing this form, I am voluntarily choosing not to purchase flood protection for my building and/or contents under a National Flood Insurance policy as indicated below."  *Id.*

acknowledgment stated, "Everyone lives in a flood zone—it is just a question of whether you live in a low, moderate, or high risk area. Nearly 25% of all flood claims are for properties located in lower-risk flood areas or those property locations where flooding is not expected."[7]

Eric Monzo signed the acknowledgment.[8] Nonetheless, it was his "understanding that this election applied only to the *buildings* located at the property and related contents .... [Eric] did not agree to waive purchase of [flood] coverage as it related to other structures located at the property . . . ."[9]

In August 2011, Nationwide accepted the Monzos' application and issued a homeowners insurance policy covering the Greenville property.[10] The final policy included "Option R Broad Water Backup of Sewers or Drains Coverage" ("Option R Coverage"), for which the Monzos paid extra premiums.[11] The Monzos specifically negotiated that Option R Coverage would apply to several water drainage systems on their lot, including: (i) an underground septic system that drains into a leach field; (ii) a sump pump system that removes water from the residence's foundation, draining into the stream; (iii) a water system

---

[7] *Id.*
[8] *See* A223-24.
[9] A224.
[10] *Id.*
[11] *See* A304; A227-28.

connected to a well; and (iv) a system of gutters that carries water from the residence's roof to the stream.[12]

## B. The Monzos File a Claim with Nationwide after a Storm Damages their Greenville Residence

On July 23, 2017, a heavy thunderstorm struck the Monzos' residence.[13] After hearing the "septic tank backup alarm," Eric Monzo "went downstairs" to silence the alarm, "found water in the basement area," and "spent the remainder of the evening and early morning cleaning, clearing, and removing the water that had seeped from the ground through the walls and floor," along with "flood or wastewater" that had "backed up" into the residence from the "septic system, . . . sump pump, [and] sump pump well . . . ."[14] Unfortunately, removing this water from the "foundation . . . coupled with the runoff into the gutters and exterior drains from the Main Residence through the subsurface piping into the nearby [s]tream was too much for the drainage system to handle."[15] A stone retaining wall containing the drainage system partially collapsed.[16]

In the storm's aftermath, the Monzos discovered that the bridges on their property were significantly damaged. "The upstream bridge collapsed completely. The downstream bridge was more substantial and did not collapse but did suffer some severe damage."[17]

---

[12] A226-28.
[13] A228.
[14] A228-29.
[15] A229
[16] *Id.*
[17] A146.

A couple of days after the storm, the Monzos contacted Papa about submitting a claim with Nationwide to cover the damage to the retaining wall and bridges.[18] Nationwide assigned the claim to Melissa Barlow-Carey, a claims associate.[19]

Around the same time that they submitted a claim, the Monzos hired Fredrick S. Roland, a structural engineer, "to investigate and determine the cause of the collapse of a stone pedestrian foot bridge that crosses a small stream on [the Monzos'] property."[20] Roland inspected the property and produced a report concluding:

> 1. The upstream bridge collapsed as a result of hidden decay below the normal water level and the supporting earth embankments being scoured away during a thunderstorm. The collapse was further exacerbated by a sudden burst of heavy rain and debris from trees whose weight was too much to be borne by the supporting bridge structure.
>
> 2. The heavy rainfall during a short period of time caused significant drainage from roof areas of the main house and into the drainage system of underground pipes which open into the stream via pipes through the stone wall. The overflow of the rain drainage caused a failure of the drainage system in that water backed up and resulted in a collapse at the area where water was being forced out of the pipes and into the creek. It is this aspect of the front stone wall that collapsed.
>
> 3. The heavy rain fall over a short period of time increased the water speed creating the scour effect that eroded the stream banks.[21]

---

[18] A86.
[19] A85.
[20] A146.
[21] A148.

Nationwide hired its own structural engineer, Sihan S. Jawad, to investigate and "determine the cause of the damage to the bridge and the stream embankment."[22]  Jawad's report concluded:

> [T]he damage to the bridges and the retaining walls . . . was caused by soil erosion and soil/hydrostatic pressure.  The heavy rain in the region on or about the loss date increased the soil/hydrostatic pressure and the flow in the stream.  Debris floating in the stream possibly dammed the flow and may have contributed to the damage to the bridges.[23]

In October 2017, Papa sent an email to Barlow-Carey to discuss the status of the Monzos' claim.[24]  Papa wrote, "It sounded like, because of the policy language (or lack thereof), that coverage could potentially be afforded.  I didn't and wouldn't tell them that[,] but I figured I'd check in to see what your thoughts are at this point."[25]  Barlow-Carey responded, "I highly doubt this will be covered."[26]

## C.    Nationwide Denies the Claim and the Monzos Sue

In November 2017, Nationwide sent the Monzos a letter denying their claim.[27]  In the letter, Nationwide asserted that the policy's earth movement and water damage exclusions applied because heavy rain, scouring, and water-borne debris combined to cause the loss.[28] Nationwide asserted that Option R Coverage was unavailable because "[t]he earth

---

[22] A87; A151.
[23] A153.
[24] A311.
[25] Id.
[26] Id.
[27] A168.
[28] A171-72.

movement and water damage exclusions . . . apply regardless of whether another covered cause of loss . . . contributed to the loss before, after, or at the same time as the excluded earth movement or 'water damage.'"[29]

Approximately one year later, the Monzos timely filed a complaint in the Superior Court.[30] The complaint alleged two counts. Count I sought a declaratory judgment "that under the terms of the Nationwide policy, [the Monzos] are entitled to immediate payment by Nationwide . . . in connection with the July 23, 2017 storm."[31] Count II alleged that Nationwide breached its contractual obligations in bad faith by refusing, "without reasonable justification," "to make complete and timely payment of insurance proceeds to [the Monzos] under the Nationwide policy . . . in connection with the July 23, 2017 storm . . . ."[32]

Despite describing the homeowners insurance policy "as part of a comprehensive insurance coverage plan,"[33] the complaint only sought coverage under the homeowners policy and did not allege that coverage could be available under another policy.[34] For example, the complaint defined "the Nationwide Policy" to mean the "homeowners insurance contract . . . ."[35]

---

[29] A172.
[30] A1.
[31] A7.
[32] A8. In 2019, the parties agreed to a stipulation dismissing the bad faith claim without prejudice. A48.
[33] A2.
[34] A1-9.
[35] A2.

In September 2019, Nationwide filed a motion for summary judgment.[36] Nationwide argued that it was entitled to summary judgment because, among other things, the policy excludes coverage for water damage and earth movement, and there was no dispute that both of those excluded perils contributed to the loss.[37] Nationwide also argued that the Option R Coverage did not apply because there was no "backup"[38] and because the policy contained an Anti-Concurrent Causation Clause (the "ACC Clause") that would defeat coverage if excluded and covered perils combined to cause the loss.[39]

The Monzos opposed the motion, arguing that summary judgment was premature because discovery was incomplete.[40] The Monzos also argued that summary judgment was inappropriate because there were disputed facts about whether the policy covered their claim.[41]

In January 2020, the Superior Court held an oral argument regarding summary judgment.[42] During the argument, the court asked Dana Spring Monzo, "[D]o plaintiffs disagree with Mr. Roland's conclusions as to what caused the damage?"[43] Dana answered,

> I would not say that we disagree. We have not finalized the full
> scope of what other areas need to be included.

---

[36] A52.

[37] *See* A70-76.  Section III.A.1, *supra*, discusses these provisions in greater detail.

[38] A80-81.

[39] A82-83.

[40] *See, e.g.*, A208-09.

[41] *See* A208-19.

[42] A438.

[43] A449.

Mr. Roland also did not enter the interior of our home to provide a full evaluation of the drainage system as it applies to Option R.

So what was supplied for the loss issue may not be a complete report for what it needed for success in litigation.[44]

On March 18, 2020, the Superior Court issued a Memorandum Opinion and Order granting Nationwide's motion for summary judgment.[45] The court began its analysis by holding that there was no dispute that scouring, heavy rain, and water-borne debris contributed to the damage:

> At oral argument, Plaintiffs conceded that they are not disputing Roland's findings. Therefore, Plaintiffs agree that the damage to the pedestrian bridge was caused, at least in part, by "supporting earth embankments being scoured away during a thunderstorm" and "debris from trees whose weight was too much to be borne by the supporting bridge structure," and that the damage to the wall was caused by "heavy rainfall during a short period of time" that drained from the roof area of the house into the underground drainage system, ultimately resulting in "a collapse [of the wall] at the area where the water was being forced out of the pipes and into the creek."[46]

Relying on this purported concession, the court held that Nationwide was entitled to summary judgment because "the facts are undisputed that the damage to both the pedestrian bridge and the wall w[as] caused by factors . . . *not* covered under the Policy, namely, 'earth

---

[44] A449-50, at 12:16-13:4.

[45] *Monzo v. Nationwide Prop. & Cas. Ins. Co.*, 2020 WL 1317276, at *1 (Del. Super. Ct. Mar. 18, 2020).

[46] *Id.* at *3 (alteration in original) (quoting A148). The court did not provide a citation to the Monzos' purported concession. The excerpt included above seems to provide the clearest example of a concession supporting the court's assertion. *See* A449-50, at 12:16-13:4.

movement' and 'water or water-borne material.'"[47]  The court held that the earth movement

exclusion applied because "scouring" is a type of earth movement:

> [W]hile it is true that neither "erosion" nor "scour" are explicitly named as excluded causes within the Policy, both fall within the Policy's "earth movement" exclusion.  "Scour" is a term that encompasses "erosion."  Moreover, "erosion" is a term used to describe a natural process, whether rapid or gradual, that wears away soil.  Thus, heavy rainfall and the scouring of the earth caused by that rainfall were "natural . . . causes" that resulted in "movement," *i.e.*, erosion, of "earth" surrounding both the pedestrian bridge and the wall.[48]

The court held that the water damage exclusion applied because there was no dispute

that water and water-borne material contributed to the damage:

> [T]he Policy excludes damage caused by "water or water-borne material," *i.e.*, by "flood, surface water . . . [or] overflow of a body of water" or by "water or water-borne material below the surface of the ground."  Although the word "rain" is not mentioned in the exclusions, "rain" contributing to a "flood" would certainly fall under these exclusions. . . . Additionally, the "debris from trees" carried by the stream was "water-borne material." . . . [I]t is undisputed, as noted in Roland's report, that a burst of rainfall swelling a stream, "material" carried along in that stream, and water moving "below the surface of the ground," *i.e.*, through the underground drainage system, damaged the pedestrian bridge and the wall.[49]

---

[47] *Monzo*, 2020 WL 1317276, at *4.
[48] *Id.* (citations omitted).
[49] *Id.* (citations omitted).

Finally, the court held that "even if non-excluded causes contributed to the damage, coverage is barred under the ACC Clause, which precludes coverage when excluded and non-excluded causes combine to cause damage."[50]

The court rejected the Monzos' argument that the Option R Coverage was available for two reasons.[51] First, the court held that the Option R Coverage did not abrogate the ACC Clause, meaning that "Plaintiffs are precluded from recovery even if both excluded and non-excluded causes combined to damage the wall . . . ."[52] Thus, the court reasoned that even if a backup covered under the Option R Coverage contributed to the loss, the Monzos were not entitled to coverage because other excluded perils, such as scouring, also contributed to the loss.

Second, the court held that Option R Coverage was unavailable because the Monzos did not suffer a covered backup:

> Option R . . . applies to damage "caused by . . . water or water-borne material" that "[b]acks up through sewers or drains from outside the dwelling's plumbing system" or "[o]verflows from a sump pump, sump pump well, or other system designed to remove subsurface water or water-borne material from the foundation area." Although Plaintiffs allege that immediately following the Storm, they had to remove water that had backed up into their residence . . . they are seeking coverage for damage to the pedestrian bridge and the wall, *not* to their residence. Moreover, while Roland's report states that water "backed up and resulted in a collapse" and "overflow[ed]" from the roof area of the house into the drainage system, it is clear from reading his

---

[50] *Id.*

[51] *Id.* at *4-6.

[52] *Id.* at *4.

12

conclusions in context that, according to Roland, water "backed up" from the roof of the house, through the underground drainage system, and into the stream, not that it "[b]acked up through sewers and drains from outside the dwelling's plumbing system" or "overflow[ed] from a . . . system designed to remove subsurface water from the foundation area."[53]

Finally, the court rejected the Monzos' argument that summary judgment "should be denied as premature."[54]  The court noted that Superior Court Civil Rule 56(b) allows a party to seek summary judgment "at any time" and held that it "ha[d] sufficient facts enabling it to render an informed decision."[55]  The Court also held that it need not wait for more discovery regarding extrinsic evidence because "the Policy's terms are clear on their face."[56]

## D.  The Superior Court Denies the Monzos' Motion to Alter or Amend the Judgment under Superior Court Civil Rule 59(d)

In March 2020, the Monzos filed a motion seeking to alter or amend the judgment under Superior Court Civil Rule 59(d) and seeking reargument under Rule 59(e).[57]  The Monzos argued that their motion was appropriate because:  (i) the Superior Court failed to respond to the Monzos' argument that summary judgment was premature; and (ii) the Superior Court improperly relied on the Roland report, which was inadmissible both because it was hearsay and because it lacked proper authentication.[58]

---

[53] *Id.* at *5 (alterations in original) (citations omitted).
[54] *Id.* at *6.
[55] *Id.*
[56] *Id.*
[57] A378.
[58] A379-84.

13

The Superior Court rejected the Monzos' motion, holding that the court's summary judgment order responded to the Monzos' argument that summary judgment was premature.[59] The court noted, "Plaintiffs' argument on this matter is the same as that raised in their brief in opposition to Nationwide's Motion for Summary Judgment and explained at oral argument, and therefore violates the requirements for a motion pursuant to Rule 59."[60]

The court rejected the hearsay and authentication arguments as untimely, noting that the Monzos could have raised both evidentiary objections in response to Nationwide's motion for summary judgment.[61] The court also cast doubt on the merits of these objections, opining that Roland's report could have qualified for the business records exception to hearsay,[62] and noting that "Plaintiffs made the Report part of the factual record by their own choosing, and thus should have anticipated that the Court would rely on the Report, as part of the record, in reaching its decision."[63]

The Monzos appeal the Superior Court's orders granting Nationwide's motion for summary judgment and denying the Monzos' post-judgment motion.

---

[59] *Monzo*, 2020 WL 2467074, at *1.
[60] *Id.* at *2.
[61] *Id.* at *3.
[62] *Id.*
[63] *Id.* (citations omitted).

## II.    STANDARD OF REVIEW

"This Court reviews a grant of summary judgment *de novo* . . . ."[64]    Summary judgment is appropriate if, "viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law."[65]  The Court "review[s] questions of law, including contract interpretation, *de novo*."[66]

The Court reviews for abuse of discretion the Superior Court's denial of a motion under Superior Court Civil Rule 59.[67]    Under Rule 59, "a motion to alter or amend [a] judgment . . . will be granted if the movant shows:  '(1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or to prevent manifest injustice.'"[68]    "[T]he Court will deny the motion if it merely restates arguments already considered and rejected during the litigation."[69]

---

[64] *Sherman v. Ellis*, – A.3d – , 2021 WL 405841, at *4 (Del. Feb. 3, 2021) (citing *Homeland Ins. Co. of N.Y. v. CorVel Corp.*, 197 A.3d 1042, 1046 (Del. 2018)); *see also Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 845 (Del. 2019).

[65] *Sherman*, 2021 WL 405841, at *4 (quoting *Homeland*, 197 A.3d at 1046).

[66] *Urdan v. WR Cap. P'rs, LLC*, – A.3d – , 2020 WL 7223313, at *4 (Del. Dec. 8, 2020) (citing *Salamone v. Gorman*, 106 A.3d 354, 367 (Del. 2014)).

[67] *See, e.g.*, *Richards v. Copes-Vulcan, Inc.*, 213 A.3d 1196, 1199-1200 (Del. 2019) ("Whether we review the . . . decision as a substantive pretrial motion or a motion for reargument, we review for abuse of discretion." (citing *Stevenson v. Swiggett*, 8 A.3d 1200, 1204 (Del. 2010))); *Christian v. Counseling Res. Assocs., Inc.*, 60 A.3d 1083, 1087 (Del. 2013)).

[68] *King v. McKenna*, 2015 WL 5168481, at *3 (Del. Super. Ct. Aug. 24, 2015) (quoting *Kostyshyn v. Comm'r of Bellefonte*, 2007 WL 1241875, at *1 (Del. Super. Ct. Apr. 27, 2007)).

[69] *Id.* (quoting *Paron Cap. Mgmt. v. Crombie*, 2012 WL 3206410, at *1 (Del. Ch. Aug. 2, 2012)); *see also Tilghman v. Del. State Univ.*, 2012 WL 5551233, at *1 (Del. Super. Ct. Oct. 16, 2012) (citations omitted) ("Motions for reargument should not be used merely to rehash the arguments already decided by the court, or to present new arguments not previously raised.").

## III.  ANALYSIS

This appeal asks the Court to decide two issues.  First, whether the Superior Court erred by granting Nationwide's motion for summary judgment.  Second, whether the Superior Court abused its discretion by denying the Monzos' post-judgment motion.  The Court addresses each issue in turn.

### A.  The Superior Court Properly Granted Summary Judgment Regarding the Pedestrian Bridge, But Erred by Granting Summary Judgment Regarding the Retaining Wall

For the purposes of summary judgment and this appeal, Nationwide admits that the Monzos have met the threshold requirements for coverage under the homeowners insurance policy.[70]  The sole question before the Court is whether, drawing all reasonable factual inferences in the Monzos' favor, the policy contains exclusions that unambiguously apply to the Monzos' claim.

The Court answers this question in three parts.  The first part introduces the relevant provisions of the homeowners insurance policy.  The second part analyzes whether Nationwide was entitled to summary judgment regarding the collapsed pedestrian bridge.  The third part analyzes whether Nationwide was entitled to summary judgment regarding the collapsed retaining wall.

---

[70] Answering Br. 13.

16

### 1. The homeowners insurance policy contains four provisions relevant to this appeal

Insurance policies are contracts, and Delaware courts apply the ordinary principles of contract interpretation to construe insurance policies.[71] Thus, "where the language of a policy is clear and unequivocal, the parties are to be bound by its plain meaning."[72]

"[W]here an ambiguity does exist," however, "the doctrine of *contra proferentem* requires that the language of an insurance policy be construed most strongly against the insurance company that drafted it. It is 'the obligation of the insurer to state the terms of the policy.'"[73] Stated differently, if there is more than one reasonable interpretation of an insurance policy, Delaware courts apply the interpretation that favors coverage.

"An insurance policy is not ambiguous merely because the parties do not agree on its construction."[74] Rather, an insurance policy "is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[75] "Delaware should not 'destroy or twist policy language

---

[71] *See, e.g.*, *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1131 (Del. Oct. 2020); *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286-88 (Del. 2001).

[72] *O'Brien*, 785 A.2d at 288 (quoting *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 745 (Del. 1997)).

[73] *Id.* (quoting *Emmons*, 697 A.2d at 745) (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)); *Steigler v. Ins. Co. of N. Am.*, 384 A.2d 398, 400 (Del. 1978)); *see also Shuba v. United Servs. Auto. Ass'n*, 77 A.3d 945, 948 (Del. 2013) ("When the language of an insurance contract is ambiguous, it 'is construed most strongly against the insurer, and in favor of the insured, because the insurer drafted the language that is interpreted.'" (quoting *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del.1982))).

[74] *In re Solera*, 240 A.3d at 1131 (citing *O'Brien*, 785 A.2d at 288).

[75] *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997)).

under the guise of construing it.' '[C]reating an ambiguity were none exists could, in effect, create a new contract . . . to which the parties [did] not assent[].'"[76]

The homeowners insurance policy contains four provisions relevant to this appeal. First, the policy contains the following earth movement exclusion:

> We do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.
>
> a) Earth Movement and Volcanic Eruption. Earth movement means: earth movement due to natural or unnatural causes, including mine subsidence; earthquake; landslide; mudslide; earth shifting, rising or sinking. Volcanic eruption means: eruption; or discharge from a volcano.[77]

Second, the policy contains the following water damage exclusion:

> We do not cover loss to any property resulting directly or indirectly from any of the following. Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss.
>
> . . . .
>
> b) Water or damage caused by water-borne material. Loss resulting from water or water-borne material damage described below is not covered even if other perils contributed, directly or indirectly to cause the loss. Water and water-borne material damage means:

---

[76] *O'Brien*, 785 A.2d at 288 (first alteration in original) (quoting *Rhone-Poulenc*, 616 A.2d at 1195-96).
[77] A280.

(1) flood, surface water, waves, tidal waves, overflow of a body of water, spray from these, whether or not driven by wind.

(2) water or water-borne material which:

> (a) backs up through sewers or drains from outside the dwelling's plumbing system; or

> (b) overflows a sump pump, sump pump well or other system designed to remove subsurface water or water-borne material from the foundation area.

(3) water or water-borne material below the surface of the ground, including water or water-borne material which exerts pressure on, seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool, or other structure.[78]

Third, embedded within the prior two exclusions is the ACC Clause stating, "We do not cover loss to any property resulting directly or indirectly from any of the following. *Such a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss*."[79]

Fourth, the policy contains the following Option R Coverage:

> We will pay up to the limit of liability . . . for direct damage to covered property caused by or resulting from water or water-borne material which:

> > 1. backs up through sewers or drains from outside the dwelling's plumbing system; or

---

[78] *Id.*

[79] *Id.* (emphasis added).

2. overflows from a sump pump, sump pump well or other system designed to remove subsurface water or water-borne material from the foundation area.

This is the most we will pay for all covered property under Coverage A — Dwelling, Coverage B — Other Structures and Coverage C — Personal Property.

EXCLUSIONS

We do not cover:

1. loss caused by the negligence of an insured; or

2. if the loss occurs or is in progress within the first five days of the Inception of this coverage unless added at renewal.

All other damage resulting from water or water-borne material not mentioned above is excluded as stated in Section I - Property Exclusion 1.b).

DEDUCTIBLE

We will pay for that part of the covered loss that is above the Section I – Deductible . . . .

All other provisions of this policy, including Section I – Deductible, apply.[80]

---

[80] A304. Section 1 – Property Exclusion 1.b) refers to the water damage exclusion discussed above. *See* A280.

### 2. The Superior Court properly granted summary judgment regarding the collapsed pedestrian bridge

The Superior Court held that Nationwide was entitled to summary judgment regarding the collapsed bridge because there was no dispute that two excluded perils contributed to the damage: (i) "earth movement" caused by the scouring of supporting earth embankments, and (ii) "water damage" caused by the weight of water and water-borne material on the bridge.[81] Noting that the policy contains an ACC Clause, the court determined that the Monzos could not prevail regardless of whether other covered perils contributed to the damage.[82]

The Monzos argue that the Superior Court erred because neither exclusion unambiguously applies to the collapsed bridge.[83] According to the Monzos, the earth movement exclusion does not apply to "scouring" because the exclusion does not mention "scouring," "erosion," or that earth movement can be combined with water.[84] In support, the Monzos note that other insurers have drafted earth movement exclusions that specifically refer to "erosion" and state that earth movement is excluded, "combined with water or not."[85]

---

[81] *Monzo v. Nationwide Prop. & Cas. Ins. Co.*, 2020 WL 1317276, at *3-4 (Del. Super. Ct. Mar. 18, 2020).

[82] *See id.* at *4-6.

[83] Opening Br. 39-47.

[84] *Id.* at 40-42.

[85] *Id.* at 41 (quoting *State Farm Fire & Cas. Co. v. Bongen*, 925 P.2d 1042, 1043 (Alaska 1996)).

Thus, the Monzos contend that the exclusion only applies to the types of earth movement the exclusion specifically lists, such as earthquakes and volcanic eruptions.[86]

The Monzos argue that the water damage exclusion does not apply to the collapsed bridge for two reasons.[87] First, the Monzos argue that the water damage exclusion only applies to damage related to getting insured property wet, not damage caused by the weight of water on insured property.[88] Second, the Monzos argue that applying the exclusion to water from the stream would make their insurance coverage illusory because Nationwide knew when it issued the policy that there was a stream on the Monzos' property.[89]

Nationwide answers that the policy's definition of excluded earth movement "includes a situation like the instant one, where water saturates the earth, causing it to shift or sink."[90] Thus, according to Nationwide, "[t]he actions described by both engineers which contributed to the collapse of the bridge would involve 'earth shifting, rising or sinking,' which is specifically listed as an exclusion in the policy."[91]

Similarly, Nationwide asserts that the water damage exclusion applies because "[t]he Policy clearly and unambiguously excludes coverage for 'water damage' caused by 'flood.'"[92] Thus, because "the 'severe storm' resulted in a rain-induced flood, which diverted

---

[86] Id. at 42.
[87] Id. at 42-46.
[88] Id. at 44.
[89] Id. at 43-44.
[90] Answering Br. 18 (citations omitted).
[91] Id. at 20 (citation omitted).
[92] Id. at 15.

22

tree debris into the stream, the policy's exclusion for 'water or damage caused by water-borne material' bars recovery.'"[93]

### a) The earth movement exclusion unambiguously applies to the collapsed bridge

The Court's analysis focuses on the earth movement exclusion, which is dispositive. The Monzos conceded below that they did not "disagree" with Roland's conclusion that "[t]he upstream bridge collapsed as a result of hidden decay below the normal water level and the supporting earth embankments being scoured away during a thunderstorm."[94] The affidavit Eric Monzo submitted in opposition to summary judgment did not contradict Roland's conclusions regarding what caused the bridge's collapse.[95] It is therefore undisputed that the pedestrian bridge collapsed, at least in part, because rainwater "scoured away" portions of the earth embankments supporting the bridge.

The verb "scour" has been defined as meaning "to remove dirt and debris from something, such as a pipe or ditch" or "to clear, dig, or remove by or as if by a powerful current of water."[96] Thus, Roland's unrebutted opinion was that water from the storm carried away earth supporting the bridge, contributing to the bridge's collapse.

---

[93] *Id.* at 17-18.

[94] *See* A449-50, at 12:16-13:4 (the Monzos' concession); A148 (Roland's report).

[95] *See* A220-31.

[96] *Scour*, Merriam-Webster.Com Dictionary (last visited Mar. 4, 2021), https://www.merriam-webster.com/dictionary/scour; *see also Scour*, Dictionary.Com ("3. to clear or dig out (a channel, drain, etc.) as by the force of water, by removing debris, etc.") (last visited Mar. 4, 2021), https://www.dictionary.com/browse/scour; *Scour*, Concise Oxford English Dictionary (12th ed. 2011) ("(of running water) erode (a channel or pool)").

The policy's earth movement exclusion provides that Nationwide will "not cover loss to any property resulting directly or indirectly from . . . earth movement due to natural or unnatural causes, including mine subsidence; earthquake; landslide; mudslide; earth shifting, rising or sinking."[97]  Although the exclusion does not list "erosion" or "scouring," the plain meaning of "earth movement" encompasses "scouring" of earth embankments. "Movement" refers to the verb "move,"[98] which means "to change the place or position of," "to transfer (something, such as a piece in chess) from one position to another," or "to cause to advance."[99]  The "scouring" of earth embankments necessarily involves "earth movement" because it refers to a "change in place or position" of earth supporting the bridge.

Similarly, "shifting" refers to the verb "shift," which means "to change place or position."[100]  The "scouring" of supporting earth embankments necessarily involves "earth shifting" because it refers to a "change [in] place or position" of the earth from the supporting embankment to the earth's final destination downstream.  Therefore, the plain meaning of "earth shifting" encompasses the "scouring" of supporting earth embankments.

The Monzos do not offer an alternative interpretation of the earth movement exclusion explaining why "scouring" is not "earth movement."  Instead, the Monzos rely on

---

[97] A280.

[98] *Movement*, Merriam-Webster.com Dictionary (last visited Mar. 4, 2021), https://www.merriam-webster.com/dictionary/movement.

[99] *Move*, Merriam-Webster.com Dictionary (last visited Mar. 4, 2021), https://www.merriam-webster.com/dictionary/move.

[100] *Shift*, Merriam-Webster.com Dictionary (last visited Mar. 4, 2021), https://www.merriam-webster.com/dictionary/shift.

a more general objection that the earth movement exclusion is only unambiguous as applied to the types of earth movement the exclusion specifically lists, such as earthquakes and volcanic eruptions.[101] This argument fails to address the exclusion's use of the word "including,"[102] a term of expansion indicating that the policy does not provide a comprehensive list of excluded earth movements. Further, the plain meanings of the enumerated terms "earth movement" and "earth shifting" encompass the scouring of supporting earth embankments for the reasons provided above.

The Monzos' argument that the exclusion does not clearly apply to earth movement when combined with water is equally unavailing. The earth movement exclusion provides that Nationwide will not cover losses "resulting directly or indirectly from . . . earth movement *due to natural or unnatural causes . . . .*"[103] The plain meaning of this exclusion does not carve out an exception for water-related earth movement. Rather, the exclusion disclaims coverage whenever some natural or unnatural cause—like rainwater—causes "earth movement" as defined under the policy.

The types of earth movement the exclusion enumerates further undercuts the Monzos' argument. The exclusion lists "mudslide[s]" as an example of excluded earth

---

[101] *See* Opening Br. 42.
[102] A280.
[103] *Id.*

25

movement.[104] Mudslides are associated with heavy rain,[105] as was the case with the scouring Roland described.[106]

Finally, the Monzos include one paragraph suggesting—without citation to the record—that "[t]he stone and rock that washed away during the storm was not loose stone or rock, but rather, was a physical part of the" bridge.[107] If properly supported, this argument might have raised some doubt regarding whether the material that the scouring moved was "earth" to which the earth movement exclusion applies. The record before the Court, however, does not support the Monzos' assertion. Roland's report concluded that "the supporting *earth* embankments" were scoured away,[108] not the stone and rock composing the bridge. And the Monzos have not provided the Court with citations to support their bridge-not-earth theory.

For the reasons provided above, the Court affirms the Superior Court's holding that the earth movement exclusion applies to the collapsed bridge. The plain meaning of "earth movement" encompasses the scouring of earth embankments, and there is no dispute that the scouring of supporting earth embankments contributed to the bridge's collapse.

---

[104] *Id.*

[105] *See, e.g.*, *Mudslide*, Meriam-Webster.com Dictionary (last visited Mar. 4, 2021) (defining "mudslide" to mean "MUDFLOW"), https://www.merriam-webster.com/dictionary/mudslide; *Mudflow*, Merriam-Webster.com Dictionary (last visited Mar. 4, 2021) ("a moving mass of soil made fluid by rain or melting snow."), https://www.merriam-webster.com/dictionary/mudflow.

[106] A148.

[107] Opening Br. 41.

[108] A148 (emphasis added).

Accordingly, the Superior Court did not err by holding that the earth movement exclusion unambiguously applies to the collapsed pedestrian bridge.[109]

### b) The ACC Clause prevents the Monzos from receiving compensation for the collapsed pedestrian bridge

The Superior Court held that the water damage exclusion unambiguously applies to the collapsed bridge because Roland concluded that the weight of water and water-borne material contributed to the damage.[110] The parties advance various arguments regarding the water damage exclusion, with the Monzos arguing that the exclusion does not apply[111] and Nationwide arguing the opposite.[112]

The Court need not address the water damage exclusion to hold that Nationwide was entitled to summary judgment. The policy contains an ACC Clause, which provides that if an excluded peril contributes to a loss, "[s]uch a loss is excluded even if another peril or event contributed concurrently or in any sequence to cause the loss."[113] Thus, because the undisputed facts show that excluded earth movement contributed to the bridge's collapse, Nationwide is entitled to summary judgment regardless of whether the water damage exclusion applies to the collapsed bridge.

---

[109] The Superior Court's holding can be read to suggest that erosion, like scouring, is a type of excluded earth movement. *See Monzo*, 2020 WL 1317276, at *4. This Court's opinion does not address whether the earth movement exclusion unambiguously applies to "erosion." Instead, the Court holds more narrowly that "scouring" of supporting earth embankments by fast-moving water is a type of excluded earth movement.

[110] *Monzo*, 2020 WL 1317276, at *4.

[111] Opening Br. 42-46.

[112] Answering Br. 15-18.

[113] A280 (emphasis added).

27

The Monzos do not propose an alternative interpretation of the ACC Clause that would allow coverage even though an excluded peril contributed to a loss. Instead, the Monzos argue that the ACC Clause does not apply to "other structures," like the pedestrian bridge, because such structures are "not real or personal property."[114]

This argument fails for three reasons. First, the Monzos waived this argument by waiting until their reply brief to assert that the ACC Clause does not apply to the collapsed bridge. "Under Supreme Court Rule 14, an appellant waives an argument if he does not argue its merits within the body of his opening brief."[115] The Monzos' opening brief does not argue that the ACC Clause does not apply to the *bridge*. Instead, the opening brief asserts that the ACC Clause does not apply to the retaining wall.[116] Thus, the Monzos failed to timely argue that the ACC Clause does not apply to the collapsed bridge.

Second, this argument would defeat the Monzos' claims for relief. The Monzos seek compensation for the collapsed bridge under Coverage B of the homeowners insurance policy. Coverage B "cover[s] accidental direct physical loss *to property* . . . ."[117] Thus, if the

---

[114] Reply Br. 18.

[115] *Ploof v. State*, 75 A.3d 811, 822 (Del. 2013).

[116] *See* Opening Br. 39 ("The Anti-Concurrent Clause . . . does not apply to Option R . . . . There is little doubt that *the drainage system* was designed to keep water from backing up into the Main Residence and to remove subsurface water . . . ." (emphasis added)); *id.* at 45 ("there could not be a reading that the anti-concurrent clause would be applicable *to the collapsed drainage structure*." (emphasis added)).

[117] A278 (emphasis added).

Monzos' argument is correct, their claim fails because the bridge is not "property" to which the insurance coverage applies.

Third, the Monzos rely on a cramped definition of "property." The plain meaning of "property" is not limited to real or personal property.[118] The pedestrian bridge plainly falls within the plain meaning of "property."

Accordingly, the Court affirms the Superior Court's holding that Nationwide was entitled to summary judgment regarding the collapsed pedestrian bridge. The undisputed facts establish that excluded earth movement contributed to the collapse, and the ACC Clause unambiguously applies to the pedestrian bridge.

### c) The Superior Court did not err by granting summary judgment while discovery was ongoing

Because the Court affirms the Superior Court's grant of summary judgment regarding the pedestrian bridge, the Court must briefly address two other issues the Monzos raise. First, the Monzos argue that the Superior Court erred by granting summary judgment before discovery was complete.[119] This argument fails because the Monzos have not identified other discovery that could change the Court's conclusion that Nationwide is entitled to summary judgment regarding the collapsed bridge.

---

[118] *See, e.g.*, *Property*, Black's Law Dictionary (10th Ed. 2014) (defining "property" as "any external thing over which the rights of possession, use, and enjoyment are exercised.").
[119] Opening Br. 26-34.

For example, the Monzos complain that "Nationwide in its responses to the interrogatories sought to improper[ly] [limit] the scope of the litigation to the Homeowners' Policy and not answer questions completely relating to other policies."[120] The Monzos reason that this limitation was improper because the homeowners policy was part of a broader package of "comprehensive insurance coverage," which included other types of insurance coverage, such as "an excess liability policy, a marine policy, automobile policy, and general liability coverage . . . ."[121]

Discovery related to other insurance policies would not change the outcome of the motion, however, because the Monzos' complaint only seeks coverage under the homeowners' insurance policy.[122] Regardless of whether Nationwide issued other policies that might cover the damage, the Monzos made a tactical decision to only seek coverage under the homeowners insurance policy. Thus, discovery regarding other insurance policies would not have helped the Superior Court answer the question the Monzos' complaint posed: whether the *homeowners insurance policy* covered the collapsed bridge.

Similarly, the Monzos argue that they needed more discovery regarding Papa's view that the homeowners insurance policy, or another policy that was part of the comprehensive

---

[120] *Id.* at 28.
[121] A221; Opening Br. 31.
[122] *See, e.g.*, A2 (defining the homeowners' insurance policy as the "Nationwide policy"), A7-8 (seeking a declaratory judgment that "the Nationwide policy" covers the Monzos' claims), A8 (alleging that a bad faith breach of contract claim on the basis that "Nationwide[] fail[ed] to make complete and timely payment of insurance proceeds . . . under the Nationwide policy . . . .").

insurance scheme, covered the collapsed bridge.[123]   Further, the Monzos argue that they needed more discovery into their discussions and negotiations with Papa regarding flood insurance and the flood insurance "waiver."[124]

This discovery would not change the analysis.  The Monzos do not allege that Papa is a legal expert, and the Superior Court did not need expert testimony to answer the purely legal question of whether the policy covered the claim.  Further, Papa's views on the potential for coverage under other insurance policies would not have helped the court determine whether *the homeowners* insurance policy covered the collapsed bridge.  Thus, the court did not need to wait to entertain more discovery regarding Papa's views on coverage.

The Monzos' argument regarding the flood insurance "waiver" fails for similar reasons.  Even if the Court accepts Eric Monzo's allegation that he did not intend to waive flood insurance covering the pedestrian bridge,[125] the earth movement exclusion would still defeat the Monzos claims.   The Option R provision—which the Monzos seem to characterize as flood insurance[126]—does not alter the earth movement exclusion and does not abrogate the ACC Clause.[127]   Thus, the Monzos cannot prevail even if the

---

[123] Opening Br. 29.
[124] *Id.* at 29-31.
[125] *See* A223-24.
[126] *See, e.g.*, Reply Br. 21 ("[T]here was no waiver of flood insurance as to the collapsed structures and Mr. Papa thought that coverage would be afforded.  Indeed, . . . Option R coverage re-inserted coverage and any ambiguity relating thereto must be read in favor of coverage." (citation omitted)).
[127] *See, e.g.*, A304 ("All other provisions of this policy . . . apply.").

Option R Coverage would apply to the water damage that the pedestrian bridge suffered. The undisputed facts establish that excluded earth movement contributed to the loss.

Finally, the Monzos assert that summary judgment was premature because Cornerstone, the company that Nationwide hired to conduct the original risk assessment,[128] had not responded to a subpoena regarding Cornerstone's inspection of the Monzos' residence.[129] As with the prior items, discovery regarding a risk assessment authored approximately six years *before* the storm would not have helped the Superior Court determine whether the undisputed facts established that an excluded peril, like earth movement, contributed to the bridge's collapse.

For the reasons provided above, the Court holds that the Superior Court's grant of summary judgment was not premature. Although discovery was incomplete, the additional discovery items the Monzos seek would not have changed the Superior Court's conclusion that Nationwide was entitled to summary judgment because excluded earth movement contributed to the bridge's collapse.

---

[128] *See* A233.

[129] Opening Br. 32.

### d) The Superior Court did not err by considering Roland's report

The Monzos also argue that the Superior Court should not have relied on Roland's report because it was incomplete and because the Monzos had not yet decided whether they intended to call Roland as an expert at trial.[130] The Monzos' arguments are unpersuasive. Even if Roland's report was "incomplete," during the oral argument the Monzos told the court that they "would not say that we disagree" "with Mr. Roland's conclusions as to what caused the damage."[131] This concession applied to Roland's conclusion that scouring contributed to the bridge's collapse,[132] and the Monzos do not explain why allowing Roland more time to draft a more comprehensive report would change his conclusion that scouring contributed to the collapse.

Similarly, whether the Monzos intended to call Roland as an expert witness has no bearing on whether the report was admissible for the purposes of assessing Nationwide's motion for summary judgment. It is also incongruous to hear the Monzos complain about the Superior Court's reliance on Roland's report. The Monzos hired Roland to investigate why the bridge collapsed,[133] and the affidavit Eric Monzo submitted in opposition to

---

[130] Opening Br. 33-34.

[131] A449, at 12:16-20.

[132] *See* A148.

[133] *See, e.g.*, A146 ("Dear Mr. Monzo: *At your request* I visited your property . . . . The purpose of that visit was to investigate and determine the cause of the collapse of a stone pedestrian foot bridge that crosses a small stream on your property." (emphasis added)).

summary judgment relied upon Roland's conclusions to support the Monzos arguments regarding why the retaining wall collapsed.[134]

Accordingly, the court did not err by relying on Roland's report. The Monzos have not provided the court with any reasonable basis to infer that additional discovery would change Roland's conclusions, failed to timely assert any credible argument challenging admissibility, and relied on Roland's report to build their own arguments opposing summary judgment with respect to the retaining wall.

### 3. The Superior Court erred by granting summary judgment regarding the collapsed retaining wall

The Superior Court held that Nationwide was entitled to summary judgment regarding the collapsed retaining wall because there was no dispute that scouring, rainwater, and water-borne debris contributed to the damage.[135] Additionally, the court held that Option R Coverage was unavailable because: (i) the Monzos did not seek coverage for damage to the residence; and (ii) the undisputed facts showed that "water 'backed up' . . . from the roof area of the house into the drainage system, . . . not that it '[b]acked up through sewers and drains from outside the dwelling's plumbing system' or 'overflow[ed] from a . . . system designed to remove subsurface water . . . .'"[136]

---

[134] *See* A229 ("Unfortunately, the removal of this subsurface water . . ., *according to Mr. Roland*, . . . was too much for the drainage system to handle. A portion of the stone drainage wall system . . . collapsed . . . ." (emphasis added)).

[135] *Monzo*, 2020 WL 1317276, at *3-4.

[136] *Id.* at *4-6.

34

The Monzos argue that the Superior Court erred by granting Nationwide's motion for summary judgment. In addition to the arguments discussed above, the Monzos assert that the earth movement exclusion does not apply to the retaining wall because, unlike the pedestrian bridge, Roland "d[id] not suggest that the collapse of the drainage system [and retaining wall] had anything to do with the erosion or scouring of the streambanks."[137]

The Monzos argue that the water damage exclusion does not defeat their claim because the Option R Coverage applies to the water backup that damaged the retaining wall.[138] Thus, although water and water-borne debris contributed to the collapse, the Monzos assert that such water damage is expressly covered under the policy.

Nationwide answers that the earth movement exclusion applies because the undisputed facts establish that scouring, a type of excluded earth movement, damaged the retaining wall.[139] Similarly, Nationwide argues that Option R Coverage is unavailable because such coverage only protects the dwelling[140] and because "the cause-in-fact of the water that . . . 'backed up' the 'drainage system of underground pipes' was from the storm, a natural phenomenon."[141]

Finally, Nationwide argues that even if the Option R Coverage is available, the Monzos' claim still fails because the Roland and Jawad reports both "concluded that debris

---

[137] Opening Br. 45.
[138] *Id.* at 44-46.
[139] Answering Br. 18.
[140] *Id.* at 24-25.
[141] *Id.* at 24.

from trees was carried by the flood waters in the stream, contributing to the damage to . . . the retaining wall."[142] Thus, Nationwide reasons that the Monzos' claim cannot succeed because there is no dispute that water-borne material, a type of excluded water damage to which Option R Coverage does not apply, contributed to the retaining wall's collapse.

The Court holds that Nationwide was not entitled to summary judgment regarding the collapsed retaining wall. Unlike the pedestrian bridge, the undisputed facts do not establish that "scouring" contributed to the retaining wall's collapse. Roland's report concluded the wall collapsed because heavy rainfall caused the drainage system to back up:

> The heavy rainfall during a short period of time caused significant drainage from roof areas of the main house and into the drainage system of underground pipes which open into the stream via pipes through the stone wall. The overflow of the rain drainage caused a failure of the drainage system in that *water backed up* and resulted in a collapse at the area where water was being forced out of the pipes and into the creek. It is this aspect of the front stone wall that collapsed.[143]

Similarly, Eric Monzo's affidavit alleged that the retaining wall collapsed because "the removal of . . . subsurface water from the Main Residence's foundation . . . coupled with the run[off] into the gutters and exterior drains . . . was too much for the drainage system to handle."[144] Neither piece of evidence unambiguously links scouring to the retaining wall.

---

[142] *Id.* at 17.
[143] A148.
[144] A229.

Further, Roland's report and Eric Monzo's affidavit describe a water backup to which Option R Coverage would apply. The Option R provision states that Nationwide will cover damage to "covered property caused by or resulting from water or water-borne material which: 1. backs up through sewers *or drains from outside the dwelling's plumbing system*; or 2. *overflows from a sump pump* . . . or other system designed to remove subsurface water or water-borne material from the foundation area."[145]

Roland concluded that the water that caused the backup came from the exterior drains that carry water from the residence's roof to the stream.[146] Similarly, Eric Monzo alleged that water from the residence's sump pump system, combined with water from "the gutters and exterior drains," overwhelmed the drainage system, causing a water backup that led to the retaining wall's collapse.[147]

The Option R provision applies to this type of water backup. The gutters and exterior drains that carry rainwater from the roof to the stream are "drains" located "outside the dwelling's plumbing system." And Roland and Eric Monzo both concluded that water from those systems overwhelmed the pipes that carried water to the stream, causing a water backup that led to the retaining wall's collapse. Thus, the record supports a reasonable inference that a backup, covered under Option R, caused the retaining wall to collapse.

---

[145] *Id.* (emphasis added).
[146] A148.
[147] A229.

Similarly, Nationwide does not dispute that the residence's sump pump system is a "sump pump" as defined under the policy.[148] Eric Monzo alleged in his affidavit that the sump pump overflowed, contributing to the glut of water that overwhelmed the drainage system.[149] Thus, the record supports a reasonable inference that an overflow from a sump pump system, covered under the second paragraph of Option R, contributed to the water backup that caused the loss.

Nationwide raises three unpersuasive arguments explaining why the Option R Coverage does not apply to the retaining wall. First, Nationwide argues that the Option R Coverage only protects the residence, and therefore does not cover damage to "other structures," like the retaining wall.[150] This argument contradicts the policy's plain meaning. Although the policy does not define the term "covered property," the Option R Coverage provision states, "This is the most we will pay for all *covered property* under" Coverages A, B, and C.[151] A reasonable policyholder would therefore expect that "covered property" refers to all of the property that the policy covers, including "other structures," like

---

[148] *See* Answering Br. 8 ("Appellants did have a small amount of water enter the basement due to the back up of water from the *sump pump*. Appellants were able to remedy the problem without any property damage. Any potential claim related to water in the basement is not part of this case.").
[149] A229.
[150] Answering Br. 24.
[151] A304 (emphasis added).

38

the retaining wall, to which Coverage B applies. Nationwide does not dispute that the retaining wall is an "other structure" covered under the policy.[152]

Nationwide's argument also conflates a *peril* that can trigger Option R Coverage— water that backs up "through sewers or drains from outside the dwelling's plumbing system"—with the *property* that the Option R Coverage insures.[153] It may be true that a policyholder seeking coverage for a backup must show that the water came from a source "outside the dwelling's plumbing system." Nonetheless, if such a covered backup occurs, Option R Coverage applies to "covered property" regardless of whether that property was part of the residence or located inside the residence.

Finally, Nationwide fails to explain why the policy uses the broad term "covered property" if Option R Coverage is limited to the "residence."[154] Nationwide's own argument relies on the policy's use of the term "residence" when describing covered backups to infer that Option R Coverage only protects the residence.[155] This language demonstrates that Nationwide was aware of the difference between the words "residence" and "covered property," and the Court will not assume that Nationwide's decision to use the broader term "covered property" was accidental.

---

[152] *See, e.g.*, Answering Br. 13 ("The Policy covers 'accidental direct physical loss' to 'Other Structures,' such as the pedestrian bridge *and the retaining wall . . . .*" (emphasis added)).
[153] *See id.*
[154] *See* A304.
[155] Answering Br. 24.

Accordingly, the Court rejects Nationwide's argument that the Option R Coverage does not apply to the retaining wall because the retaining wall is not part of the residence. Nationwide did not include such a limitation in the policy, and a reasonable policyholder would not expect that Option R Coverage is so limited.

Second, Nationwide suggests that Option R Coverage only applies to water from artificial sources, such as sewer backups, and therefore does not apply to backups caused by natural phenomena, like rain.[156] Nothing in the policy limits Option R Coverage to backups from artificial sources. The trigger for Option R Coverage is damage to covered property caused by "[w]ater or water-borne material . . . [that] backs up through sewers or drains . . . [or] overflows from a sump pump . . . or other system designed to remove subsurface water or water-borne material from the foundation area."[157] This language does not create the distinction between natural and artificial sources of water that Nationwide suggests. Adding a limitation on coverage that Nationwide failed to include in its policy would be contrary to Delaware law construing ambiguous contract provisions in favor of policyholders.[158] Accordingly, the Court rejects Nationwide's argument that Option R Coverage only applies to backups caused by artificial events.

Third, Nationwide argues that even if Option R Coverage is available, the Monzos' claim still fails because other types of excluded water damage contributed to the retaining

---

[156] *Id.* at 24-25.
[157] A304.
[158] *See, e.g.*, *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 286-88 (Del. 2001).

wall's collapse.[159] As noted above, the undisputed facts support a reasonable inference that the sole cause of the retaining wall's collapse was a water backup from the residence's drainage system. Thus, there remain disputed facts regarding whether other types of excluded water damage contributed to the loss.

Further, the water damage exclusion would not unambiguously apply to tree debris carried by the force of water into the stream. Although such tree debris might meet the ordinary definition of "water-borne material," the policy defines "water-borne material damage" to mean either: (i) a backup of water-borne material, as defined under Option R, or (ii) "water or water-borne material *below the surface of the ground* . . . ."[160] This language does not unambiguously apply to the tree debris that could have damaged the retaining wall. Tree debris carried in the stream is not "below the surface of the ground" because the stream is not below the ground. Similarly, tree debris carried into the drainage system would not be excluded because the Option R Coverage expressly covers that peril.

Thus, the only variety of excluded water damage that *might* have contributed to the loss is "flood, surface water, waves, tidal waves, overflow of a body of water, spray from these, whether or not driven by wind." Nonetheless, for the reasons provided above, the undisputed facts do not establish that such water contributed to the retaining wall's collapse.

---

[159] Answering Br. 25-27.

[160] *See* A280; A304.

41

Accordingly, the Court reverses the Superior Court's order granting Nationwide summary judgment regarding the collapsed retaining wall. There are material disputed facts regarding whether the sole cause of the damage was a water backup to which the policy's Option R Coverage applies.

**B.      The Superior Court Did Not Abuse Its Discretion by Denying the Monzos' Motion under Superior Court Civil Rule 59**

The Monzos argue that the Superior Court abused its discretion by denying their post-judgment motion under Rule 59.[161] According to the Monzos, the Superior Court should have granted the motion for three reasons. First, summary judgment was premature because discovery was ongoing.[162] Second, the Superior Court should not have relied on the Roland report, which was incomplete, lacked authentication, and was inadmissible hearsay.[163] Third, the record and the policy did not support summary judgment.[164]

The Court rejects each argument. For the reasons discussed above, summary judgment was not premature; the Superior Court did not err in relying on the Roland report; and, the record and policy supported summary judgment, as explained above. Accordingly, the Court holds that the Superior Court did not abuse its discretion by denying the Monzos' Rule 59 motion. The Monzos could not use Rule 59 to rehash arguments that they made, or could have made, before the court granted summary judgment.

---

[161] Opening Br. 48.
[162] *Id.* at 48-49.
[163] *Id.* at 49-51.
[164] *Id.*

42

## IV.    CONCLUSION

For the reasons provided above, the Court AFFIRMS-in-PART and REVERSES-in-PART the Superior Court's March 18, 2020 Memorandum Opinion and Order and AFFIRMS the Superior Court's May 13, 2020 Order.