# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

MORGAN T. ZURN
VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

July 23, 2024

Blake A. Bennett, Esquire
Cooch and Taylor, P.A.
1000 North West Street, Suite 1500
Wilmington, DE 19801

John L. Reed, Esquire
DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801

RE: ***Vladimir Gusinsky Revocable Trust v. Gregory J. Hayes, et al.,***
Civil Action No. 2022-1124-MTZ

Dear Counsel:

A stockholder ("Plaintiff") of nominal defendant Raytheon Technologies Corporation ("RTX") wants to bring a derivative action against current and former members of RTX's board of directors (together "Defendants") based on violations of compensation plans. Plaintiff asserts it can bring derivative claims without first demanding that RTX's board[1] (the "Demand Board") bring them because a majority of the Demand Board faces a substantial likelihood of liability for knowingly violating the plans. Defendants moved to dismiss the claims for failure to plead demand futility under Court of Chancery Rule 23.1.[2] Plaintiff has not pled the bad

---

[1] When this action was filed, RTX's board of directors had thirteen members: Gregory Hayes, Robert (Kelly) Ortberg, Tracy Atkinson, Dinesh Paliwal, James Winnefeld, George Oliver, Margaret O'Sullivan, Ellen Pawlikowski, Denise Ramos, Frederic Reynolds, Brian Rogers, and Robert Work and nonparty Bernard A. Harris Jr.

[2] Rule 23.1 was amended on September 25, 2023. *In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER). No substantive revisions were made to the relevant portion of Rule

faith required to establish a substantial likelihood of liability.[3]  The motion to dismiss

is granted.

## I.     BACKGROUND

Before April 2020, United Technologies Corporation ("UTC") was a publicly

traded company that did business in the aerospace, HVAC, and elevator industries.

It issued equity awards to thousands of employees through two contracts:  a 2014

long-term incentive plan and a 2018 long-term incentive plan (together, the

---

23.1.  *Id.* at 29.  Rule 23.1 was again amended on June 14, 2024, and again no substantive revisions were made to the relevant portion.  *In re: Amendments to Rules 1–6, 8, 9, 11–15, 23, 23.1, 79, 79.1, 79.2 and 174 of the Court of Chancery Rules, Section I, II, III, IV, X, and XVI* (Del. Ch. May 31, 2024) (ORDER).  Nevertheless, I proceed under the Rules as they were drafted at the time this action was filed.  *See Lebanon Cnty. Emps'. Ret. Fund v. Collis*, 311 A.3d 773, 780 n.19 (Del. 2023).

[3] For purposes of the pending motion, I draw the following facts from the verified amended complaint and the documents attached to or integral to it, admissions on file, together with any affidavits, discovery of record and public filings.  *See Ryan v. Gifford*, 935 A.2d 258, 265 (Del. 2007); *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *7 (Del. Ch. Dec. 17, 2013) ("Applying [Delaware] Rule [of Evidence] 201, Delaware courts have taken judicial notice of publicly available documents that are required by law to be filed, and are actually filed, with federal or state officials."); Ct. Ch. R. 12(b).

Citations in the form of "Am. Compl." refer to Plaintiff's Verified Amended Stockholder Derivative Complaint, available at docket item ("D.I.") 11.  Citations in the form of "DOB" refer to Defendants' Opening Brief in Support of Their Motion to Dismiss, available at D.I. 15; citations in the form of "PAB" refer to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss, available at D.I. 20; citations in the form of "DRB" refer to Defendants' Reply Brief in Further Support of Their Motion to Dismiss, available at D.I. 23.  Citations in the form "Reed Aff." refer to the affidavit of John L. Reed, available at D.I. 15.

"LTIPs"). The awards included stock options and stock appreciation rights ("SARs") that were administered by the UTC board directly, "or if the [b]oard elects, by the [c]ompensation [c]ommittee or such other committee of the [b]oard as the [b]oard may from time to time designate."[4] Except in the case of a spinoff or other event contemplated by the LTIPs, the SARs and stock options could be modified only with approval from UTC's stockholders.[5]

### A. The Transaction And Employees Matters Agreement

In November 2018, UTC determined to spin off two of its operating subsidiaries, Carrier Global Corporation ("Carrier") and Otis Worldwide Corporation ("Otis") (the "Spinoff").[6] The Spinoff would create three publicly traded companies: United Technologies, which would hold UTC's aerospace and defense business; Carrier, which would hold UTC's HVAC business; and Otis, which would hold UTC's elevator business.[7] The Spinoff was set to occur in 2020.

---

[4] Reed Aff., Ex. 2 § 2(a) [hereinafter "2018 LTIP"]; *see also* Reed Aff., Ex. 3 §§ 3(a), 2(i) [hereinafter "2014 LTIP"].

[5] 2014 LTIP §§ 5(c), 10; 2018 LTIP §§ 2(a), 5(c), 3(e).

[6] Am. Compl. ¶ 73.

[7] *Id*.

In June 2019, UTC and Raytheon Company ("Raytheon") announced an all-stock merger between United Technologies and Raytheon (together with the Spinoff, the "Transaction") to form RTX.[8]  The merger was to occur immediately after the Spinoff, closing before markets opened on April 3, 2020.[9]

On December 11, 2019, the UTC compensation committee met to discuss the treatment of UTC's equity awards following the Transaction.[10]  In considering potential valuation methodologies for the awards, the committee identified that "the goal of the valuation method is to best approximate the 'true value' of [Carrier's, Otis's, and RTX's] stock post-spin."[11]  It assessed precedent spinoffs to determine the most common post-spinoff valuation method.[12]  After discussions, the compensation committee approved the use of a multi-day "volume-weighted average price" ("VWAP") methodology to calculate the conversion of the awards post-close.[13]  Tracking precedent transactions, the conversion formula adjusted the

---

[8] RTX's amended and restated certificate of incorporation includes an exculpatory provision.  Reed Aff., Ex. 15.

[9] Am. Compl. ¶¶ 1, 92.

[10] *Id*. ¶ 87 (citing D.I. 6, Ex. 6).

[11] Am. Compl. ¶ 89 (quoting D.I. 6, Ex. 6 at -0030).

[12] D.I. 6, Ex. 6 at -0028.

[13] Am. Compl. ¶ 87; D.I. 6, Ex. 6 at -0030 to -0033.

number of awards employees would hold, along with the exercise prices of their SARs and stock options, by using the VWAP of RTX, Carrier, or Otis stock on the fourth and fifth trading days following the spinoff, which would be April 8 and April 9.[14]  The conversion formula was memorialized in an employees matters agreement (the "EMA"), which UTC, Carrier, and Otis executed on April 2, 2020.[15]

### B.  Unprecedented Market Volatility

The Transaction closed before markets opened on April 3, 2020, in the early waves of the COVID-19 pandemic, "during a period of pronounced market volatility."[16]  In the matter of a month, "[f]rom the onset of the COVID crisis through [the] [T]ransaction close, [the price of pre-spinoff UTC] shares decreased by 43%."[17]

As to RTX specifically, "[t]he conversion formula was designed to convert the pre-spinoff UTC awards into RTX awards of approximately the same value as of market close on April 9."[18]  When the formula was set, the pre-spinoff UTC awards converted into RTX awards were worth "almost exactly the same amount as

---

[14] Am. Compl. ¶ 3.

[15] *Id*. ¶ 2; Reed Aff., Ex. 4.

[16] Reed Aff., Ex. 5 at -0124.

[17] *Id*.

[18] Am. Compl. ¶ 4.

[the pre-spinoff awards] on April 2."[19]   But by April 9, RTX stock had risen significantly above UTC's April 2 pre-spinoff price: on April 2, UTC closed "at $50.73" and on April 3, RTX opened at $51.00; but by the VWAP calculation dates, April 8 and April 9, RTX closed at $62.62 and $64.71 respectively.[20]

The equity award conversion fell victim to the market volatility and raised concerns of negative "impacts . . . on employee retention, morale and incentives, and [on] the treatment of retirees" for RTX.[21]   Within days after the conversion, management sought feedback from outside advisors.  By April 17, RTX had drafted an accounting memo (the "Memo") regarding the accounting consequences of a potential EMA amendment, which it reviewed with PriceWaterhouseCoopers LLP ("PwC").[22] PwC concurred with the Memo's accounting conclusion as of that date.[23] By April 19, RTX received an analysis by Goldman Sachs concerning the implied impact to the equity awards following the Transaction.[24]  Goldman Sachs indicated

---

[19] *Id.*

[20] *Id.* ¶ 92 ("The volume-weighted average price per share for RTX stock on April 8 and 9 was $63.90." (citing Reed Aff., Ex. 5 at -0127)).

[21] Am. Compl. ¶ 93.

[22] Reed Aff., Ex. 5 at -0126; Reed Aff., Ex. 11 at -0292.

[23] Reed Aff., Ex. 5 at -0126.

[24] *Id.* at -0123 to -0125.

this spinoff was unlike precedent spinoffs because of unexpected stock volatility upon the "onset of the COVID crisis."[25]  It also identified that "in comparable [l]arge [c]ap spin[offs] the median 5-day share price movement post separation was [less than] 1–4%," but the RTX price movement post-spinoff was a 28% difference.[26]

One day after receiving Goldman Sachs' analysis, outside counsel from Wachtell, Lipton, Rosen & Katz ("Wachtell") contacted the New York Stock Exchange (the "NYSE"), informing it that the spinoff conversion had an "unintended outcome" of "fail[ing] to preserve the pre-separation values of the awards . . . due to unanticipated market volatility" and needed to be "correct[ed]."[27]  Wachtell asked if an EMA amendment adjusting the spinoff conversion required stockholder approval under the NYSE listed company manual rule 303A.08.[28]  On April 22, NYSE representatives orally relayed that in the NYSE's view, no stockholder vote was required.

---

[25] *Id*. at -0124.

[26] *Id*.

[27] *Id*. at -0138.

[28] *Id*.

###### C. The EMA Amendment

On April 27, the RTX board (the "Board") met to discuss the unexpected outcome of the awards conversion.[29] All fifteen directors were in attendance.[30] The Board considered retroactively amending the EMA equity award adjustment provisions. The Board discussed the Memo and received a presentation from outside counsel and management.[31] The proposed amendment as set forth in the Memo was for "the post-separation stock prices [to] be measured based on the opening stock price . . . on the day of the separation (April 3), resulting in $51 for RTX, $43.76 for Otis, and $13.75 for Carrier."[32] The Memo stated that "for accounting purposes there is not a modification of these awards separate from the spin-off modification" and clarified that "the grant date of the modification is the spin[off] date."[33] RTX's general counsel and CFO reviewed with the Board "the consequences of the valuation inputs as [set] forth in the EMA on awards held by RTX, Otis, and Carrier

---

[29] Am. Compl. ¶ 93; Reed Aff., Ex. 5 at -0103 to -0038.

[30] Am. Compl. ¶ 93.

[31] Reed Aff., Ex. 6 at -0220 to -0222; Reed Aff., Ex. 5 at -0126.

[32] Reed Aff., Ex. 5 at -0127.

[33] Am. Compl. ¶¶ 101, 104; Reed Aff., Ex. 5 at -0126. Plaintiff contends the amendment to the EMA "was a second, separate modification to equity awards and was not part of the spinoff, thus," under the LTIPs, "the Board was required to obtain shareholder approval." PAB 21.

employees and retirees."[34] The presentation demonstrated that "for tax purposes" a potential amendment would be considered a separate modification.[35] The presentation also indicated the spinoff conversion's objective was an "[e]quitable conversion that maintains value of awards pre and post-spin[off]" while "minimiz[ing] volatility that could inadvertently decrease or increase value."[36] For its part, Wachtell suggested a new VWAP post-spinoff benchmark set for April 3, instead of April 8 and April 9, which would bring the post-spinoff share price movement more in range with the other comparable spinoffs mentioned by Goldman Sachs.[37] The April 3 date would yield a 1% difference in share price movement as opposed to the seven-day 28% difference.[38]

The Board discussed a potential EMA amendment but did not decide upon it. The Board made no decision concerning whether stockholder approval would be

---

[34] Am. Compl. ¶ 94 (quoting Reed Aff., Ex. 6 at -0221).

[35] Am. Compl. ¶101; Reed Aff., Ex. 6 at -0118.

[36] Reed Aff., Ex. 5 at -0105.

[37] Am. Compl. ¶ 112; Reed Aff., Ex. 5 at -0120.

[38] Am. Compl. ¶ 97; *id.* ¶ 92 (indicating UTC stock price closed the last trading day at $50.73 and RTX stock price closed at $64.71 on April 9); Reed Aff., Ex. 5 at -0124 (indicating the median 5-day share price movement post separation for comparable spinoffs was less than 1–4%).

required under the LTIPs.[39]  Instead, the Board unanimously approved the creation

of a special committee (the "Special Committee") comprised of three former

Raytheon directors.[40]  Each was determined to be "independent and disinterested

with respect to the [p]otential [a]mendment," and each was a member of RTX's

compensation committee, which one of them chaired.[41]

The Board then issued the Special Committee resolutions (the "Resolutions"),

expressly stating the committee was formed for the purposes of:

> (a) reviewing, analyzing and evaluating the [p]otential [a]mendment,
> (b) overseeing the negotiation of the terms and conditions of the
> [p]otential [a]mendment, (c) determining whether the [p]otential
> [a]mendment (and any related agreements or other documentation) is
> in the best interests of the [c]orporation and its shareowners and (d)
> providing final approval for the [p]otential [a]mendment (and any
> related agreements or other documentation) and related matters if they
> are determined to be in the best interests of the [c]orporation and its
> shareowners.[42]

The Resolutions further authorized the Special Committee to "undertake all actions

that, in the determination of the [c]ommittee, are required to fulfill the [c]ommittee

---

[39] *See, e.g.*, Am. Compl. ¶¶ 13, 109, 160; PAB 38.

[40] Reed Aff., Ex. 6 at -0230 to -0232 (identifying Atkinson, Paliwal, and Winnefeld); Am. Compl. ¶ 113.

[41] Reed Aff., Ex. 6 at -0230; Am. Compl. ¶¶ 20, 27, 32, 34, 113.

[42] Reed Aff., Ex. 6 at -0230.

[m]andate," to "take such other actions, as the [c]ommittee determines necessary, appropriate or advisable in connection with any and all aspects of the [p]otential [a]mendment," and to "exercise all the powers and authority of the Board" in connection with matters at issue in the Resolutions.[43]

The Special Committee met three times in May to discuss whether to amend the Transaction's VWAP formula.[44] The Special Committee's advisors, including Wachtell and the committee's executive compensation consultant Frederic W. Cook & Co., participated in each meeting.[45] On May 22, the Special Committee unanimously approved the EMA amendment (the "EMA Amendment") on behalf of RTX,[46] citing the LTIPs for its authority to adjust the awards in the spinoff context without a stockholder vote.[47]

The Special Committee formalized its approval of the EMA Amendment in resolutions. The Special Committee's resolutions articulated that the committee had the authority to approve the EMA Amendment on RTX's behalf because the Board

---

[43] *Id*. at -0230 to -0231.

[44] Reed Aff., Exs. 8–10.

[45] *Id*.

[46] Otis and Carrier declined to participate in the EMA Amendment.

[47] Reed Aff., Ex. 10 at -0361.

or a Board committee has authority under the LTIPs and other related compensation plans, and the Board's committee mandate conferred that authority on the Special Committee.[48]

On May 29, 2020, RTX filed a Form 8-K with the SEC disclosing that, on May 22, 2020, RTX had entered an amendment of the EMA that modified the definition of "UTC Post-Separation Stock Value."[49] The EMA Amendment based the conversion on the day one trading price rather than on a day four and five VWAP formula.

### D. Plaintiff Files This Action.

On June 16, 2020, Plaintiff made a demand under 8 *Del. C.* § 220 to inspect RTX's books and records.[50] On December 6, 2022, Plaintiff filed a complaint without making a pre-suit litigation demand.[51] When Plaintiff filed its complaint, the Demand Board had thirteen members.[52]

---

[48] *Id.*

[49] Am. Compl. ¶ 129.

[50] Reed Aff., Ex. 1.

[51] D.I. 1.

[52] Am. Compl. ¶ 144.

On February 27, 2023, Defendants moved to dismiss and filed an opening brief.[53]   On May 18, 2023, Plaintiff responded to the Motion with an amended complaint.[54] That complaint now asserts three claims against the RTX directors who served at the time of the EMA Amendment:  (i) breach of fiduciary duty against all director defendants; (ii) unjust enrichment against two management directors;[55] and (iii) corporate waste against all director defendants.[56]  Defendants moved to dismiss the amended complaint for failure to plead demand futility.[57]  I heard oral argument on March 27, 2024.

## II.    ANALYSIS

In evaluating whether a pre-suit demand is futile, I begin my analysis with Delaware law's "'cardinal precept . . . that directors, rather than shareholders, manage the business and affairs of the corporation.'"[58]  Because of this precept, when "a stockholder seeks to displace the board's authority over a litigation asset

---

[53] D.I. 6.

[54] *See generally* Am. Compl.

[55] This claim is brought only against Hayes and Ortberg.

[56] *Id.* ¶¶ 162–74.

[57] *See generally* DOB.

[58] *SDF Funding LLC v. Fry*, 2022 WL 1511594, at *10 (Del. Ch. May 13, 2022) (quoting *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)).

and assert the corporation's claim,"[59] Court of Chancery "Rule 23.1 requires that a Plaintiff . . . allege with particularity why demand is excused."[60] It is a "heightened pleading standard,"[61] and "the demand requirement is not excused lightly."[62] Thus, where the plaintiff has not made a pre-suit demand on the board, "the [c]omplaint must be dismissed unless it alleges particularized facts showing that demand would have been futile."[63] "The facts are considered 'in their totality' and all reasonable inferences are drawn in the plaintiffs' favor."[64] But the plaintiff "cannot rely on 'conclusory allegations' or 'inferences that are not objectively reasonable.'"[65]

---

[59] *United Food & Com. Workers Union v. Zuckerberg* (*Zuckerberg I*), 250 A.3d 862, 876 (Del. Ch. 2020) (citing *Aronson*, 473 A.2d at 811).

[60] *Ryan v. Armstrong*, 2017 WL 2062902, at *10 (Del. Ch. May 15, 2017) (citing Ct. Ch. R. 23.1).

[61] *City of Hialeah Empls.' Ret. Sys. ex rel. nCino, Inc. v. Insight Venture P'rs, LLC*, 2023 WL 8948218, at *5 (Del. Ch. Dec. 28, 2023) (quoting *Zuckerberg I*, 250 A.3d at 876, *aff'd sub nom. United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg* (*Zuckerberg II*), 262 A.3d 1034 (Del. 2021)).

[62] *Zuckerberg II*, 262 A.3d at 1049.

[63] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015) (citation omitted).

[64] *Clem v. Skinner*, 2024 WL 668523, at *5 (Del. Ch. Feb. 19, 2024) (quoting *Del. Cnty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015)).

[65] *Clem*, 2024 WL 668523, at *5 (internal quotation marks omitted) (quoting *In re Go Pro, Inc.*, 2020 WL 2036602, at *8 (Del. Ch. Apr. 28, 2020)).

Here, Plaintiff seeks to establish demand futility on the familiar basis that a majority of the Demand Board "faces a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."[66] If Plaintiff pleads facts supporting that conclusion for a majority of the Demand Board, then demand is excused.[67] Reaching half depends on the impartiality of seven directors who did not serve on the Special Committee (the "Seven Directors").[68] Because RTX's certificate of incorporation exculpates directors from monetary liability for breaches of fiduciary duty to the fullest extent permitted by the Delaware General Corporation Law, and because the claim on which Plaintiff seeks to establish liability requires the directors to have knowingly exceeded their authority, Plaintiff must plead bad faith conduct by the Seven Directors.[69]

---

[66] PAB 17–18; *Zuckerberg II*, 262 A.3d at 1059.

[67] *Zuckerberg II*, 262 A.3d at 1059.

[68] *See* Compl. ¶ 14. The Seven Directors are Oliver, O'Sullivan, Pawlikowski, Ramos, Reynolds, Rogers, and Work. *Id.* ¶ 144. Plaintiff did not provide a director-by-director analysis. Plaintiff concedes demand is not excused as to director Harris, who joined the Board in April 2021 and is not named as a defendant, and Defendants concede demand is excused as to directors Hayes and Ortberg, who owned significant unvested equity that were affected by the EMA Amendment and are thus not disinterested. PAB 21; DOB 12; Am. Compl. ¶ 145. Demand as to the three Special Committee members is not dispositive because even if demand is excused for them, two more would still need to be found impartial.

[69] Reed Aff., Ex. 15; *Zuckerberg II*, 262 A.3d at 1057; *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 320–323, 330 (Del. Ch. 2022).

To plead bad faith, a plaintiff must show either "[(i)] an extreme set of facts to establish that disinterested directors were intentionally disregarding their duties or [(ii)] that the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'"[70] "The business judgment rule will not be rebutted, and thus demand will not be excused, when a plaintiff alleges only that a board of directors failed to follow the terms of a stock incentive plan."[71] A plaintiff must do more: otherwise, "finding demand futile in these instances effectively would nullify the business judgment rule and eviscerate the demand requirement."[72] A plaintiff can demonstrate that demand is excused by pleading "particularized facts that indicate that the board knowingly or deliberately failed to adhere to the terms of a stock incentive plan."[73]

---

[70] *Newman v. KKR Phorm Invs., L.P.*, 2023 WL 5624167, at *7 (Del. Ch. Aug. 31, 2023) (quoting *In re MeadWestvaco S'holders Litig.*, 168 A.3d 675, 684 (Del. Ch. 2017)).

[71] *Pfeiffer v. Leedle*, 2013 WL 5988416, at *5 (Del. Ch. Nov. 8, 2013) (citing *Freedman v. Redstone*, 2013 WL 3753426, at *9 (D. Del. July 16, 2013); *Weiss v. Swanson*, 948 A.2d 433, 447 (Del. Ch. 2008)).

[72] *Pfeiffer*, 2013 WL 5988416, at *5.

[73] *Id.*; *accord Garfield*, 277 A.3d at 330 ("[A]llegations that the directors knowingly exceeded their authority are sufficient to state a claim that the directors breached their duty of loyalty." (citing *Allen v. El Paso Pipeline GP Co.*, 90 A.3d 1097, 1108 (Del. Ch. 2014))).

Here, Plaintiff argues the Board acted in bad faith, with conscious disregard for their responsibilities and intentional dereliction of duty, by (i) "determin[ing] that stockholder approval was not necessary" in violation of the LTIPs, and by (ii) "delegating authority for final approval of the EMA Amendment to the Special Committee, which [is] authority the Board lacked."[74] That theory falters in two places: that the Board made any decision at all about stockholder approval, and that the Board did so in bad faith.

Plaintiff contends the full Board, not just the Special Committee, determined the EMA Amendment did not require a stockholder vote. Plaintiff argues the "plain language of the Board's resolutions creating the Special Committee" show the Board made a decision concerning stockholder approval.[75] Plaintiff contends the Resolutions' language empowering the Special Committee to "provid[e] final approval" empowers the Special Committee to approve the EMA Amendment itself, without considering or calling for a stockholder vote.[76] Plaintiff argues that narrow mandate "is incompatible with seeking shareholder approval" and shows the Board

---

[74] PAB 20.

[75] *Id*. 32.

[76] *Id*. 33–34.

decided to forego stockholder approval.[77]  Defendants counter that "nothing in the text of the [R]esolutions . . . disabled the [S]pecial [C]ommittee from considering whether an amendment would require stockholder approval."[78]  Thus, in Defendants' view, the plain text of the Resolutions does not show the Board decided to forego stockholder approval.

To resolve this dispute, I must read the Resolutions "as a whole, giv[e] meaning to each term,"[79] and prefer "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms . . . [over] an interpretation which leaves a part unreasonable, unlawful, or of no effect."[80]  Further, the Court must "'give each provision and term effect, so as not to render any part of the contract mere surplusage.'"[81]

I read the Resolutions as Defendants do.  The Resolutions did not identify the Special Committee, or anyone else, as the source of approval.  Rather, they

---

[77] *Id*. 34.

[78] D.I. 36 at 31.

[79] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019).

[80] *Id.* at 846 n.64 (quoting Restatement (Second) of Contracts § 203 (Am. L. Inst. 1981)).

[81] *Sunline*, 206 A.3d at 839 (quoting *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010)).

established one purpose of the Special Committee was "providing final approval."[82]

Further, the plain meaning of "provide" includes an act to "procure" or "to supply."[83]

Thus, the Resolutions tasked the Special Committee with "procuring" final approval and gave it flexibility "to undertake all actions that, in the determination of the [c]ommittee, are required to fulfill the [c]ommittee [m]andate."[84] Further, the Resolutions empowered the Special Committee "[t]o take such other actions, as the [c]ommittee determines necessary, appropriate or advisable in connection with any and all aspects of the [p]otential [a]mendment."[85] The Special Committee could procure final approval by seeking stockholder approval if it so chose.[86] Plaintiff has not pled that the Board decided approval should come from the Special Committee.

---

[82] *See* Reed Aff., Ex. 6 at -0230.

[83] *Provide*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/provide (last visited July 18, 2024) (defining "provide" to mean, first, "to supply or make available"); *Provide*, *Black's Law Dictionary* (6th ed. 1990) (defining "provide" to mean "to make, procure, or furnish").

[84] Reed Aff., Ex. 6 at -0230.

[85] *Id.*, at -0231.

[86] This conclusion, that the Board's delegation to the Special Committee did not compel the Special Committee to itself approve the EMA Amendment, also dispenses with Plaintiff's argument that the Board violated the LTIPs in delegating approval to the Special Committee. The Resolutions gave the Special Committee "the powers and authority of the Board" to determine whether and how to provide approval for a potential EMA amendment. Reed Aff., Ex. 6 at -0231.

Even if the Board made the decision to forego stockholder approval, Plaintiff's pleadings fatally undercut the position that the Board did so in knowing violation of the LTIPs. Plaintiff pleads the "Special Committee approved the modification" and that "neither the full Board nor the Compensation Committee even discussed the requirements of the UTC LTIPs."[87] Plaintiff states "[t]he Board never expressly considered or decided whether the EMA Amendment would, or even could, require shareholder approval under the LTIPs."[88] Plaintiff alleges the Board did not "consider whether the plans required stockholder approval for the modification," "[n]or did they determine that stockholder approval was not required."[89] And Plaintiff alleges "the [c]ompensation [c]ommittee and full Board were not even aware that the details of the EMA amendment could implicate the stockholder approval requirements in the . . . LTIPs."[90] Taking Plaintiff at its word, the Board made no determinations concerning the EMA Amendment, and certainly none that were deliberately and knowingly in violation of the LTIPs.

---

[87] Am. Compl. ¶ 160.

[88] PAB 38.

[89] Am. Compl. ¶ 160.

[90] *Id.*

To be sure, Delaware law contemplates the Court can infer the essential element of knowledge from a "plain and unambiguous violation" of a compensation plan's "plain and unambiguous restriction on the fiduciary's authority."[91] That inference is unreasonable here, even at this plaintiff-friendly stage, because of Plaintiff's specific and insistent allegations that the Board "never expressly considered or decided whether" a stockholder vote was required under the LTIPs.[92] Plaintiff's numerous allegations that the Board never thought about the stockholder approval requirement or made any decision about it at all foreclose the inference that the Seven Directors knowingly violated that requirement.[93] To make that inference despite those allegations would graft the essential knowledge element of bad faith to

---

[91] *Garfield*, 277 A.3d at 331; *see also Pfeiffer*, 2013 WL 5988416, at *9 ("[Plaintiff] has alleged sufficiently that the [b]oard clearly violated an unambiguous provision of the [p]lan … a *prima facie* showing of such a clear violation supports an inference that the Board either knowingly or deliberately exceeded its authority.").

[92] PAB 38.

[93] Plaintiff separately argues that the Seven Directors acted in bad faith by failing to be adequately informed. However, for unexculpated claims, "[i]t is not enough to allege that the directors should have been better informed." *McElrath v. Kalanick*, 224 A.3d 982, 993 (Del. 2020). Board minutes demonstrate the Board discussed a potential EMA Amendment and was informed of management and PwC input, advice from Wachtell, and NYSE's position concerning a stockholder vote. Thus, "[t]he complaint's allegations do not lead to a reasonable inference that the board intentionally ignored" the EMA Amendment entirely; instead, it shows that the Board was informed of a potential amendment and delegated authority to the Special Committee to consider its desirability and terms. *Id.*

circumstances where Plaintiff has pled knowledge was wholly absent. That would be inconsistent with at least three aspects of Delaware law: (i) that "[t]he plaintiff is the master of the complaint;"[94] (ii) that compensation plan violations do not automatically amount to bad faith conduct that would rebut the business judgment rule and establish demand futility;[95] and (iii) that exculpated directors are dismissed from litigation when the plaintiff has not pled the directors acted disloyally.[96]

Likewise, Plaintiff's contention that the Board knowingly acted in bad faith by "fail[ing] to act seek [sic] shareholder approval once the final terms of the EMA Amendment became public" fails.[97] Having pled the Board did not think about any stockholder approval requirements at all, Plaintiff does not plead that the Board made any conscious decision to refrain from action on that point.

---

[94] *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 23 (Del. Ch. 2009); *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("A plaintiff generally is master of its complaint and can choose what it wants to plead."), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[95] *See Pfeiffer*, 2013 WL 5988416, at *5; *see also Garfield*, 277 A.3d at 296.

[96] *In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015) ("[A] plaintiff can survive a motion to dismiss by that director defendant by pleading facts supporting a rational inference that the director harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith." (citing *Malpiede v. Townson*, 780 A.2d 1075, 1094 (Del. 2001); *Orman v. Cullman*, 794 A.2d 5 (Del. Ch. 2002))).

[97] PAB 39.

Thus, Plaintiff has failed to plead the Board knowingly exceeded its authority by failing to seek stockholder approval.[98]  Plaintiff has therefore failed to plead bad faith as to the Seven Directors and demand is not excused.  I need not reach Plaintiff's other arguments.

Because demand is not excused as to Count I, it follows that demand is not excused as to Count III for waste, which is predicated on the same conduct as the Plaintiff's breach of fiduciary duty claim.[99]  Finally, because the Seven Directors are impartial as to the EMA Amendment, demand is not excused as to Count II for unjust enrichment.

## III.    CONCLUSION

Defendants' motion to dismiss is GRANTED.

Sincerely,

*/s/ Morgan T. Zurn*

Vice Chancellor

MTZ/ms
cc:  All Counsel of Record, via *File & ServeXpress*

---

[98] For the same reasons, Plaintiff's allegations that the Board acted in bad faith by "knowingly or recklessly" permitting public disclosures "that concealed the nature and effect of the EMA amendment" do not establish a substantial likelihood of liability for the Seven Directors.  Am. Compl. ¶ 166.

[99] *Id.* ¶ 174 ("As a direct and proximate result of these breaches of their fiduciary duties, RTX has sustained and will continue to sustain significant damages, as alleged herein.").